## KOSSICK v. UNITED FRUIT CO.

No. 96.   Argued February 20, 1961.—Decided April 17, 1961.

*Jacob Rassner* argued the cause and filed a brief for petitioner.

*Eugene Underwood* argued the cause for respondent. With him on the brief was *Frank I. Fallon*.

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case calls in question the propriety of a dismissal before trial of the first cause of action in a seaman's diversity complaint.   Dismissal was on the ground that

the allegations of the complaint are deficient by reason of the New York Statute of Frauds.

The allegations of the complaint, which for present purposes must be taken as true, are in substance as follows: Petitioner, while employed as chief steward on one of the vessels of respondent, United Fruit Company, suffered a thyroid ailment, not attributable to any fault of the respondent, but with respect to which it concededly had a legal duty to provide him with maintenance and cure. (*The Osceola*, 189 U. S. 158.) Respondent insisted that petitioner undergo treatment at a United States Public Health Service Hospital. Petitioner, however, considering on the basis of past experience that such treatment would prove unsatisfactory and inadequate, notified respondent that he wished to be treated by a private physician who had agreed to take care of him for $350, which amount petitioner insisted would be payable by the respondent in fulfillment of its obligation for maintenance and cure.

Respondent, the complaint continues, declined to accede to this course, but agreed that if petitioner would enter a Public Health Service Hospital (where he would receive free care) it would assume responsibility for all consequences of improper or inadequate treatment. Relying on that undertaking, and being unable himself to defray the cost of private treatment, petitioner underwent treatment at a Public Health Service Hospital. The Public Health Service Hospital and private physician alluded to were both located in New York.

Finally, it is alleged that by reason of the improper treatment received at such hospital, petitioner suffered grievous unwonted bodily injury, for which the respondent, because of its undertaking, is liable to the petitioner for damages in the amount of $250,000.[1]

---

[1] Apparently any cause of action against the United States arising out of the alleged negligence of its agents in treating petitioner was

The District Court dismissed the complaint, considering that the agreement sued on was void under the New York Statute of Frauds, N. Y. Personal Property Law, § 31, par. 2,[2] there being no allegation that such agreement was evidenced by any writing, 166 F. Supp. 571.[3] The Court of Appeals affirmed. 275 F. 2d 500. We brought the case here because it presented novel questions as to the interplay of state and maritime law. 363 U. S. 838.

At the outset, we think it clear that the lower courts were correct in regarding the sufficiency of this complaint as depending entirely upon its averments respecting respondent's alleged agreement with petitioner. Liability here certainly cannot be founded on principles of *respondeat superior*. Nor is there anything in the authorities relating to a shipowner's duty to provide maintenance and cure which suggests that respondent was obliged, as a matter of law, to honor petitioner's preference for private treatment, or that it was responsible for the quality of petitioner's treatment at other hands which, for all that appears, may reasonably have been assumed to be well trained and careful.

With respect to respondent's alleged agreed undertaking, as the case comes to us, petitioner, on the one hand, does not deny the contract's invalidity under the New

---

barred by the running of a shorter statute of limitations than is applicable to the contract alleged here. Compare 28 U. S. C. § 2401 (b) with New York Civil Practice Act, § 48.

[2] New York Personal Property Law, § 31, par. 2, provides:
"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the person to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking;

  .        .        .        .        .

"2. Is a special promise to answer for the debt, default or miscarriage of another person."

[3] A second cause of action for maintenance and cure was subsequently discontinued by petitioner, 275 F. 2d, at 502.

734

York Statute of Frauds, if state law controls, nor, on the other hand, can its validity well be doubted, though the alleged agreement was not reduced to writing, if maritime law controls. For it is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law.[4] In this posture of things two

---

[4] Although the question has not often been litigated, *Union Fish Co. v. Erickson,* 248 U. S. 308; see *United States Fidelity & Guaranty Co. v. American-Hawaiian S. S. Co.,* 280 F. 1023; *Hastorf v. Long-W. G. Broadhurst Co.,* 239 F. 852; *Quirk v. Clinton,* 20 Fed. Cas. No. 11,518; *Northern Star S. S. Co. v. Kansas Milling Co.,* 75 F. Supp. 534, it is well accepted that maritime contracts do not as a generality depend on writing for their validity. As Judge Hough, one of the most distinguished of the federal admiralty judges, once said: ". . . [This] failure to stress force of custom, in maritime matters, is found in *Union Fish Co. v. Erickson [supra],* where with obvious correctness the California statute of frauds was not permitted to defeat a shipmaster's libel for wrongful discharge from an engagement for more than one year. . . . [T]he ground of decision should have been the simple one that such engagements, orally made, were as old as the history of marine customs, had passed into the maritime law of the United States, and would be recognized and enforced by the courts of the nation,—so that what California said on the subject (if anything) was merely immaterial." Hough, Admiralty Jurisdiction— Of Late Years, 37 Harv. L. Rev. 529, at 537.

Writing of a different sort of contract, an equally distinguished British admiralty judge has said that ". . . it is common practice for commercial men to assume very extensive financial obligations on the nod of a head or the initialing of a slip, and many binding chartering engagements are no doubt daily concluded in an informal manner. . . ." *Soc. Portuguesa de Navios Tanques, Ltd. v. Hvalfslsk Polaris A/S,* [1952] 1 Lloyd's List Reports 73, 74 (per McNair, J.), in which opinion he is confirmed by Kent, 3 Commentaries 159–160 (1828 ed.), and the French authority, Pothier, Maritime Contracts 10 (Cushing trans.). True, a seaman's contract of hire, his articles, have long been required to be in writing by statutes of the various maritime nations, among them one of the first ·⁻atutes passed by our Congress, 1 Stat. 131 (1790). Compare 2 Geo. II, c. 36 (1729). But this rule was clearly instituted for the protection of the seaman, Curtis, Merchant Seamen 37, and in no way assumes the invalidity of such con-

questions must be decided: *First,* was this alleged contract a maritime one? *Second,* if so, was it nevertheless of such a "local" nature that its validity should be judged by state law?

## I.

The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude or include certain common types of contract: a contract to repair, *Endner* v. *Greco,* 3 F. 411, or to insure a ship, *Insurance Co.* v. *Dunham,* 11 Wall. 1, is maritime, but a contract to build a ship is not. *People's Ferry Co.* v. *Beers,* 20 How. 393. Without doubt a contract for hire either of a ship or of the sailors and officers to man her is within the admiralty jurisdiction. 1 Benedict, Admiralty, 366. A suit on a bond covering cargo on general average is governed by admiralty law, *Cie Francaise de Navigation* v. *Bonnasse,* 19 F. 2d 777, while an agreement to pay damages for another's breach of a maritime charter is not, *Pacific Surety Co.* v. *Leatham & Smith T. & W. Co.,* 151 F. 440. The closest analogy we have found to the case at hand is a contract for hospital services rendered an injured seaman in satisfaction of a shipowner's liability for maintenance and cure, which has been held to be a maritime

tracts in the absence of writing. In our law the seaman who ships without articles can recover the highest wages paid at the port of embarcation, as well as subjecting the master who took him on board to penalties, 46 U. S. C. §§ 564, 578; Norris, The Law of Seamen, §§ 91, 119. An *Ordonnance* of Louis XIV declares that if the seaman's contract is not in writing, the seaman's oath as to its provisions must be credited, Pothier, *supra,* at 100, while Lord Tenterden, Merchant Ships and Seamen 476, expressly states that an oral contract of hire is not invalid but only results in a penalty against the master. The *Union Fish* case, *supra,* no more than exemplifies the enforceability of an oral maritime contract of hire.

736

contract. *Methodist Episcopal Hospital* v. *Pacific Transport Co.*, 3 F. 2d 508. The principle by reference to which the cases are supposed to fall on one side of the line or the other is an exceedingly broad one. "The only question is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce . . . ." I Benedict, Admiralty, 131.[5]

The Court of Appeals here held:

> "The contract sued on is not a maritime contract, since it was merely a promise to pay money, on land, if the former seaman should suffer injury at the hands of the United States Public Health Service personnel, on land, in the course of medical treatment. . . . For all that appears in the complaint, it may well be that the contract sued on was allegedly made after the maritime contract of employment of the plaintiff had been terminated. It really makes no difference whether this was so or not. All that remained was the performance by the shipowner of its undisputed obligation to supply maintenance and cure. The shipowner supplied plaintiff with a master's certificate, which was used by him to obtain admittance as a patient in the United States Public Health Service Hospital. . . . That took care of the obligation to furnish 'cure.' . . ."

With respect to the learned judges below, we think that is too narrow a view of the matter. It can as well be argued that the alleged contract related to and stood in place of a duty created by and known only in admiralty as a kind of fringe benefit to the maritime contract of hire. See *Cortes* v. *Baltimore Insular Line*, 287 U. S. 367. The

---

[5] Benedict goes on to quote from an anonymous commentary on the Mediaeval Statutes of Culm, one of the early sources of maritime law, that anything pertaining to navigation or seamen is to be considered a part of the maritime law.

Court of Appeals and respondent are certainly correct in considering that a shipowner's duty to provide maintenance and cure may ordinarily be discharged by the issuing of a master's certificate carrying admittance to a public hospital, and that a seaman who refuses such a certificate or the free treatment to which it entitles him without just cause, cannot further hold the shipowner to his duty to provide maintenance and cure. *Williams* v. *United States,* 133 F. Supp. 319; *Luth* v. *Palmer Shipping Co.,* 210 F. 2d 224; *The Bouker No. 2,* 241 F. 831; see *Calmar S. S. Corp.* v. *Taylor,* 303 U. S. 525. But without countenancing petitioner's intemperate aspersions against Public Health Service Hospitals, and rejecting as we have the noncontractual grounds upon which he seeks to predicate liability here, we nevertheless are clear that the duty to afford maintenance and cure is not simply and as a matter of law an obligation to provide for entrance to a public hospital. The cases which respondent cites hold no more than that a seaman who can receive adequate and proper care free of charge at a public hospital may not "deliberately refuse the hospital privilege, and then assert a lien upon his vessel for the increased expense which his whim or taste has created." *The Bouker No. 2, supra,* at 835. Presumably if a seaman refuses to enter a public hospital or, having entered, if he leaves to undergo treatment elsewhere, he may recover the cost of such other treatment upon proof that "proper and adequate" cure was not available at such hospital. Cf. *Williams* v. *United States, Luth* v. *Palmer Shipping Co., supra.*

No matter how skeptical one may be that such a burden of proof could be sustained, or that an indigent seaman would be likely to risk losing his rights to free treatment on the chance of sustaining that burden, since we should not exclude that possibility as a matter of law as the Court of Appeals apparently did, it must follow that the con-

tract here alleged should be regarded as an agreement on the part of petitioner to forego a course of treatment which might have involved respondent in some additional expense, in return for respondent's promise to make petitioner whole for any consequences of what appeared to it at the time as the cheaper alternative. In other words, the consideration for respondent's alleged promise was petitioner's good faith forbearance to press what he considered—perhaps erroneously—to be the full extent of his maritime right to maintenance and cure. Compare, American Law Institute, Restatement, Contracts §§ 75, 76. So viewed, we think that the alleged agreement was sufficiently related to peculiarly maritime concerns as not to put it, without more, beyond the pale of admiralty law.

This brings us, then, to the remaining, and what we believe is the controlling, question: whether the alleged contract, though maritime, is "maritime and local," *Western Fuel Co.* v. *Garcia,* 257 U. S. 233, 242, in the sense that the application of state law would not disturb the uniformity of maritime law, *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205.

## II.

Although the doctrines of the uniformity and supremacy of the maritime law have been vigorously criticized—see *Southern Pacific Co.* v. *Jensen, supra,* at 218 (dissenting opinion); *Standard Dredging Co.* v. *Murphy,* 319 U. S. 306, 309—the qualifications and exceptions which this Court has built up to that imperative doctrine have not been considered notably more adequate. See Gilmore and Black, Admiralty, *passim;* Currie, Federalism and the Admiralty: "The Devil's Own Mess," 1960, The Supreme Court Review, 158; The Application of State Survival Statutes in Maritime Causes, 60 Col. L. Rev. 534. Perhaps the most often heard criticism of the supremacy doc-

trine is this: the fact that maritime law is—in a special sense at least, *Romero* v. *International Terminal Co.*, 358 U. S. 354—federal law and therefore supreme by virtue of Article VI of the Constitution, carries with it the implication that wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant. But the process is surely rather one of accommodation, entirely familiar in many areas of over-lapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a trans-action as to which both have some concern. Surely the claim of federal supremacy is adequately served by the availability of a federal forum in the first instance and of review in this Court to provide assurance that the fed-eral interest is correctly assessed and accorded due weight.

Thus, for instance, it blinks at reality to assert that because a longshoreman, living ashore and employed ashore by shoreside employers, performs seaman's work, the State with these contacts must lose all concern for the longshoreman's status and well-being. In allowing state wrongful death statutes, *The Tungus* v. *Skovgaard*, 358 U. S. 588; *The Hamilton*, 207 U. S. 398, and state survival of actions statutes, *Just* v. *Chambers*, 312 U. S. 383, respectively, to grant and to preserve a cause of action based ultimately on a wrong committed within the admiralty jurisdiction and defined by admiralty law, this Court has attempted an accommodation between a liability dependent primarily upon the breach of a mari-time duty and state rules governing the extent of recovery for such breach. Since the chance of death foreclosing recovery is necessarily a fortuitous matter, and since the recovery afforded the disabled victim of an accident need be no less than that afforded to his family should he die, the intrusion of these state remedial systems need not

bring with it any undesirable disuniformity in the scheme of maritime law.

Altogether analogous reasoning was used by Mr. Justice Brandeis in *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U. S. 109, where it was held that a New York court could properly compel arbitration under the arbitration clause of a maritime contract. It was there reasoned that since such clauses are valid in admiralty and their breach gives rise to an action for damages, to compel arbitration is really to do no more than substitute a different and more effective remedy for that available in admiralty.

The line of cases descended from the early precedent of *Cooley* v. *Board of Wardens,* 12 How. 299, and most recently added to by *Huron Portland Cement* v. *Detroit,* 362 U. S. 440; see also *Kelly* v. *Washington,* 302 U. S. 1, exemplify but another variation of this process of accommodation. In the *Huron* case we allowed the City of Detroit to impose the requirements of its smoke control regulations on vessels coming to the city, even though they had measured up to federally imposed standards as to ship's boilers and equipment. There the matter was put thus:

> ". . . The thrust of the federal inspection laws [with which petitioner had complied] is clearly limited to affording protection from the perils of maritime navigation. . . .
>
> "By contrast, the sole aim of the Detroit ordinance is the elimination of air pollution to protect the health and enhance the cleanliness of the local community. . . .
>
> . . . . .
>
> "Congressional recognition that the problem of air pollution is peculiarly a matter of state and local concern is manifest in . . . legislation." 362 U. S., at 445–446.

Turning to the present case, we think that several considerations point to an accommodation favoring the application of maritime law. It must be remembered that we are dealing here with a contract, and therefore with obligations, by hypothesis, voluntarily undertaken, and not, as in the case of tort liability or public regulations, obligations imposed simply by virtue of the authority of the State or Federal Government. This fact in itself creates some presumption in favor of applying that law tending toward the validation of the alleged contract. *Pritchard* v. *Norton,* 106 U. S. 124; Ehrenzweig, Contracts in the Conflict of Laws, Part One: Validity, 59 Col. L. Rev. 973. As we have already said, it is difficult to deny the essentially maritime character of this contract without either indulging in fine-spun distinctions in terms of what the transaction was *really* about, or simply denying the alleged agreement that characterization by reason of its novelty. Considering that sailors of any nationality may join a ship in any port, and that it is the clear duty of the ship to put into the first available port if this be necessary to provide prompt and adequate maintenance and cure to a seaman who falls ill during the voyage, *The Iroquois,* 194 U. S. 240, it seems to us that this is such a contract as may well have been made anywhere in the world, and that the validity of it should be judged by one law wherever it was made. On the other hand we are hard put to perceive how this contract was "peculiarly a matter of state and local concern," *Huron Portland Cement* v. *Detroit, supra,* unless it be New York's interest in not lending her courts to the accomplishment of fraud, something which appears to us insufficient to overcome the countervailing considerations. Finally, since the effect of the application of New York law here would be to invalidate the contract, this case can hardly be analogized to cases such as *Red Cross Line* v. *Atlantic Fruit,* or *Just* v. *Chambers, supra,* where state law had the effect of sup-

plementing the remedies available in admiralty for the vindication of maritime rights. Nor is *Wilburn Boat Co. v. Fireman's Ins. Co.*, 348 U. S. 310, apposite. The application of state law in that case was justified by the Court on the basis of a lack of any provision of maritime law governing the matter there presented. A concurring opinion, *id.*, at 321, and some commentators have preferred to refer the decision to the absurdity of applying maritime law to a contract of insurance on a houseboat established in the waters of a small artificial lake between Texas and Oklahoma. See Gilmore and Black, Admiralty 44–45. Needless to say the situation presented here has a more genuinely salty flavor than that.

In sum, were contracts of the kind alleged in this complaint known to be a normal phenomenon in maritime affairs, we think that there would be little room for argument in favor of allowing local law to control their validity. A different conclusion should not be reached either because such a contract may be thought to be a rarity, or because of any suspicion that this complaint may have been contrived to serve ulterior purposes. Cf. 275 F. 2d, at 501; 166 F. Supp., at 573–574, note 1, *supra*. Without remotely intimating any view upon the merits of petitioner's claim, we conclude that it was error to apply the New York Statute of Frauds to bar proof of the agreement alleged in the complaint.

*Reversed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE STEWART joins, dissenting.

Certainly no decision in the Court's history has been the progenitor of more lasting dissatisfaction and disharmony within a particular area of the law than *Southern Pacific Co. v. Jensen*, 244 U. S. 205. The mischief it has caused was due to the uncritical application of the loose doctrine of observing "the very uniformity

in respect to maritime matters which the Constitution was designed to establish." *Southern Pacific Co.* v. *Jensen, supra,* at 217. The looser a legal doctrine, like that of the duty to observe "the uniformity of maritime law," the more incumbent it is upon the judiciary to apply it with well-defined concreteness. It can fairly be said that the *Jensen* decision has not been treated as a favored doctrine. Quite the contrary. It has been steadily narrowed in application, as is strikingly illustrated by such a *tour de force* as our decision in *Davis* v. *Department of Labor,* 317 U. S. 249.

The Court today, relying as it does on *Jensen,* reinvigorates that "ill-starred decision." *Davis* v. *Department of Labor, supra,* at 259 (concurring opinion). The notion that if such a limited and essentially local transaction as the contract here in issue were allowed to be governed by a local statute of frauds it would "disturb the uniformity of maritime law" is, I respectfully submit, too abstract and doctrinaire a view of the true demands of maritime law. I would affirm the judgment below.

MR. JUSTICE WHITTAKER, dissenting.

Like the Court of Appeals, 275 F. 2d 500, I think the oral contract here claimed by petitioner was not a maritime but a New York contract and barred by its statute of frauds. New York Personal Property Law, § 31, par. 2. I therefore dissent.