**CHILSAN MERCHANT MARINE CO., LTD.**

v.

**M/V K FORTUNE, her bunkers, engines, Tackle, apparel, furniture, etc., in rem, Vadel S.A., SK Shipping Co., Ltd., and Cosco Bulk Shipping Co., Ltd, in personam**

No. CIV.A.99–3587.

United States District Court, E.D. Louisiana.

Aug. 18, 2000.

Robert burns Fisher, Jr., H. michael Bush, Chaffe, McCall, Phillips, Toler & Sarpy, LLP, New Orleans, LA, for Chilson Merchant Marine Co., Ltd.

Ashton Robert O'Dwyer, Jr., Heather Ashman Johnson, Lemle & Kelleher, LLP, New Orleans, LA, for Cosco Bulk Carrier Co. Ltd.

Michael A. Calomb, William Steven Mannear, Poynter, Mannear & Colomb, Baton Rouge, LA, for Delfin Abel, Florente R. Della, Felix Gonzales, Jojit O Staana.

### ORDER AND REASONS

BARBIER, District Judge.

At the request of defendant Cosco Bulk Shipping Company, Ltd. ("Cosco Bulk") the Court held an evidentiary hearing on Thursday, August 10, 2000, to resolve factual issues regarding whether a settlement had been entered into between plaintiff, Chilsan Merchant Marine Company ("Chilsan"), and Cosco Bulk. For reasons discussed more fully below, the Court finds that a settlement agreement between the

parties was reached on the afternoon of December 2, 1999.

## BACKGROUND

This action arises out of a maritime charter agreement involving the parties to this suit. Briefly, the M/V K FORTUNE was time chartered by defendant Cosco Bulk, who, as head time-charterer, in turn time chartered the vessel to Bulktrans (Europe) Limited ("Bulktrans"). Bulktrans in turn sub-time chartered the vessel to Chilsan. In connection with its time charter, Chilsan paid $91,451.20 for fuel and oil bunkers on board the vessel; however, shortly afterward, the M/V K FORTUNE was withdrawn by Cosco Bulk from Chilsan's custody, as a result of Bulktrans' failure to pay hire to Cosco Bulk. At the point the vessel was withdrawn from Chilsan, the value of the fuel and oil bunkers allegedly remaining on board was approximately $78,772.25. Unable to recoup by other means the value of the bunkers for which it had paid, on November 26, 1999, at the instruction of Chilsan's London solicitors, Clyde & Company, New Orleans attorney Robert Fisher of Chaffe, McCall filed the instant suit arresting the vessel and sequestering her bunkers on behalf of Chilsan.

## THE ALLEGED SETTLEMENT NEGOTIATIONS

On the afternoon of December 1, 1999, Fisher received a call from an employee of Kerr–Norton Steamship Company in New Orleans, informing him that Kerr–Norton was the local boarding agent for Cosco Bulk, the head charterer of the M/V K FORTUNE, and that someone from Cosco Bulk's head office in New Jersey would be contacting Fisher shortly regarding the arrest of the vessel. Later that afternoon, Paul Campbell, an employee of Sea Mark Management, Inc. ("Sea Mark"), contacted Fisher, expressing with some urgency his desire to resolve the situation in such a way that the vessel would be released. The parties do not appear to dispute this fact, or that Campbell's primary goal in initiating contact with Fisher was to secure release of the vessel as soon as possible. Fisher, who acknowledged that the release could be accomplished by either entering into a security agreement or settling the entire matter with Cosco, discussed both with Campbell. Fisher testified that Campbell asked him what it would take to settle the case, to which Fisher replied that he did not have exact figures but would obtain them from London and call Campbell back the next morning. Fisher called Alex McIntosh at Clyde & Company, and then followed up with a fax to him informing the London solicitors of the status of the matter and seeking instructions on what amount Chilsan would accept in settlement of the matter. *See* Chilsan Exh. 6.

It is important to note that during their initial conversation, Campbell identified himself as a Sea Mark employee, and, according to Fisher, stated that Sea Mark was part of Cosco in New Jersey. While Fisher had not previously dealt with Sea Mark, he had dealt with Cosco on many occasions, and he noted that Sea Mark and the Cosco entity he had previously had dealings with shared the same address. Fisher testified that Campbell used the term "agency role", and also that they joked about the reasons why Cosco might have seen fit to change the name of its subsidiary to Sea Mark. Additionally, Campbell was very well acquainted with the facts and issues surrounding the case; so much so that Fisher initially assumed he was an attorney.[1] At any rate, Fisher testified that Campbell—who after all had

---

1. While he subsequently learned that Campbell was not an attorney, Fisher testified that in conversations with Campbell he was impressed by how educated, articulate, and experienced in the maritime industry Campbell was. Campbell's own testimony bears out that he was quite experienced in maritime matters—he had been with Cosco since 1996, and despite his title of "Marketing Manager," he had broad experience in the operational aspects of Cosco's business.

called him to inquire what it would take to settle the case—gave no indication that he was not acting or could not act for Cosco Bulk in this matter.

On the following morning, December 2, 1999, Campbell and Fisher spoke again, this time in more specifics as to the dollar amounts involved. The details of this conversation are memorialized in Fisher's fax to Campbell, which begins: "Confirming our **settle** [sic] conversations yesterday and today, we are now pleased to provide you with our client's position on **settlement**." Chilsan Exh. 7; Cosco Bulk Exh. 3a (emphasis added).[2] The letter goes on to detail Chilsan's valuation of the bunker claim ($91,451.00); the rate, but not the exact amount, of interest (9.25%); and costs for attorney's fees, filing fees, and U.S. Marshal fees, which it desired to recoup in the settlement ($10,200).

Fisher further testified at the hearing that the terms of the letter bear out that what was contemplated was a settlement rather than posting of security, because if he were attempting to reach a security agreement, he would have required 150% of the value of the bunkers be deposited in an escrow account. It was his testimony that the fact that the principal amount requested corresponded to the original amount paid by Chilsan for the bunkers, and not 150% of that amount, indicated that the parties' discussions related to a settlement, not a security agreement.

About half an hour after sending the letter contained in Chilsan Exhibit 7,[3] Fisher testified that he received a call from Campbell saying the figures contained in the letter were acceptable. Campbell also requested banking details in

order to transfer money to Chilsan. Fisher then prepared another letter providing details on Chaffe, McCall's client trust account. Chilsan Exh. 8; Cosco Bulk Exh. 3b.[4] While dictating that letter, he was informed by a member of his staff that the U.S. Marshal's fee had been underestimated in the previous letter, and in fact that the fees were $2000, rather than the $1000 previously quoted. He added language to this effect in a postscript, requesting that Cosco Bulk increase the total payment to Chilsan by $1000.

Fisher testified that shortly after this letter was sent, Campbell called again, and communicated that in the context of a ninety-plus thousand dollar agreement, the additional $1000 for the U.S. Marshal would not be a problem.[5] However, an issue remained as to where the money would be sent, since Campbell stated that Cosco Bulk was concerned that wiring the money to Chilsan's attorneys could be construed as an admission of liability. After some delay, incurred while Fisher attempted to contact his instructing solicitors in London, Fisher faxed Campbell again and explained why they did not wish the money to be placed in a Hong Kong or Korean account, and explaining that wiring it to New Orleans would not be construed as an admission of liability. Chilsan Exh. 9; Cosco Bulk Exh. 3c.[6] At that point, Fisher considered the matter to have been settled, with the remaining detail of what account the money should be placed in still to be resolved.

In this vein, he sent a final fax to Campbell on the afternoon of December 2, 1999, confirming the settlement amount and requesting a response regarding the wire transfer question. Chilsan Exh. 10; Cosco

---

2. The fax was sent at 11:21 a.m. on December 2, 1999.

3. Cosco Bulk Exh. 3a.

4. This fax was sent at 12:24 p.m. on December 2, 1999.

5. Fisher testified that Campbell's words were "It sounds good to me."

6. It is unclear at what time this fax was dictated, but presumably it was before the fax included as Chilsan Exhibit 10. However, it was not sent until 4:52 p.m. on December 2, 1999. At the hearing, Fisher testified that because of a backlog of faxes at the firm and difficulties with a temporary secretary, his faxes were not being sent promptly.

Bulk Exh.3d. While this letter was apparently dictated by Fisher around 3:30 p.m., due to secretarial problems and faxing problems, it was not actually sent until 5:39 p.m.

At approximately 5:00 p.m. the same day, Fisher received a call from New Orleans attorney Ashton O'Dwyer, who stated that he was representing Cosco Bulk in the matter. When Fisher told him the matter had already been settled with Cosco's New Jersey office, O'Dwyer responded that he was mistaken. It is worth noting that Fisher had previously asked Campbell if Cosco would be retaining a New Orleans attorney, and Campbell had told him no.

At approximately 5:55, Fisher received a final telephone call from Campbell, in which he apologetically stated that he had misunderstood his authority and that there was no settlement.

### COSCO BULK'S VERSION OF EVENTS

Cosco Bulk called as its sole witness Paul Campbell, who testified as to his recollection of the events of December 1–2, 1999. Campbell is currently employed as a National Liner Services Specialist by Cosco North America, Inc. (Cosco N.A.), the general agent for Cosco Container Lines of Shanghai. Previously (since May of 1996), he served as Assistant Manager of the Non–Liner Services Department for Cosco N.A. However, in January 1998, the president of Cosco Americas, parent of Cosco N.A., created Sea Mark Management, and Campbell went with Sea Mark. He became Marketing Manager for Sea Mark in 1999. Sea Mark and Cosco N.A., which are located in the same building, are distinct corporate entities. While Cosco N.A. originally was general agent for all Cosco vessels, from January 1998 on, Cosco N.A. had no agency responsibility for non-liner tanker vessels. At the time of the events relevant to this case, Sea

Mark's principal was defendant Cosco Bulk, based in Tianjin, China. Cosco Bulk appointed Sea Mark as "owner's protective agent" for the M/V K FORTUNE, to attend to the vessel's cargo operations on the Mississippi river. According to Campbell, absent specific written instructions, Sea Mark had no actual authority to settle claims for Cosco Bulk. Campbell testified that such an arrangement was normal, and that the writing requirement was "the Cosco way." Campbell reported to Zang Xiaoping, the president of Sea Mark, who in turn reported to Cosco Bulk. Campbell stated that he himself had no direct communication with Cosco Bulk.

Campbell testified that on December 1, 1999, Zang requested that Campbell contact the New Orleans lawyers responsible for the arrest of the M/V K FORTUNE to see what needed to be done to release the vessel. According to Campbell, he called Fisher at Chaffe, McCall in New Orleans, and told him that "we are the vessel's agent," and that he wanted to lift the arrest of the vessel to avoid any delay in the vessel's departure.

Campbell testified that he knew the difference between settling a claim and posting security for a claim, and that his instructions were not to settle the case, but merely to arrange security, and that in all of his communications with Fisher, that was what he was attempting to do. In his affidavit, Campbell stated that his role was to gather information for Zang to pass along to the Chinese principal, and that he informed Fisher that he was a messenger to Cosco Bulk. Aff., ¶¶ 8 & 9. He stated that he never indicated to Fisher that he was a Cosco representative with authority to settle the case. *Id.*, ¶ 9.

According to Campbell, when he received Fisher's first fax of December 2, 1999,[7] and noticed the "settlement" language and the fact that there was no calculation of interest and no total provided, it was his belief that they were negotiating

---

**7.** Chilsan Exh. 7; Cosco Bulk Exh. 3a.

the posting of security to release the vessel, not a settlement. After reviewing the fax, Campbell called Fisher and told him he would require a total which included the amount due for interest, and also that he needed banking details to arrange a funds transfer.

Subsequently, Fisher sent Campbell the fax containing details for transferring funds to Chaffe, McCall's trust account, with the postscript regarding the increase due for the U.S. Marshal's fee. Chilsan Exh. 8; Cosco Bulk Exh. 3b. While acknowledging a telephone conversation following the sending of that fax, Campbell testified that he had "no recollection" of telling Fisher "it sounds good to me" after Fisher mentioned the additional $1000 due to the U.S. Marshal, stating that anything he did say at that point that had positive connotations was merely an acknowledgment of receipt of the fax.

According to Campbell, after he received both faxes, he called Zang at home and read him both letters. Chilsan Exhs. 7 & 8; Cosco Bulk Exhs. 3a & b. Zang instructed Campbell to call Fisher and tell him that they could not agree to the settlement, because a transfer to Chaffe, McCall could be construed as an admission of liability. Campbell also testified that Zang instructed him to put nothing in writing. In keeping with his instructions from Zang, Campbell called Fisher on the afternoon of December 2, and told him that he "apologized for any confusion" and that he "had no authority to settle the claim." Campbell did not receive Fisher's final fax, confirming a settlement in the amount of $96,265.52, until the following morning.

With respect to the relationship between the various Cosco entities, and his position within them, on direct examination, Campbell testified that he disclosed Sea Mark's agency relationship to Cosco Bulk, his employment status as Marketing Manager with Sea Mark, and identified Cosco Bulk as his principal. He also testified that in talking to Fisher over December 1 and 2, he realized that Fisher was under the impression that he represented Cosco and had authority to settle the claim. Nevertheless, because he had previously disclosed his position and the companies' relationship, he did not correct Fisher's misunderstanding. In Campbell's words, an individual could only confuse the entities if he was guilty of "sloppy thinking."

### DISCUSSION

As a threshold matter, the Court finds that maritime law applies to this dispute. The substantive claims in this case are based on Chilsan's alleged maritime lien arising out of its sub-time charter of a vessel. As such, the claims are maritime in nature, and federal maritime law applies to the validity of the agreement to settle them. *Mid–South Towing Co. v. Har–Win, Inc.*, 733 F.2d 386, 389 (5th Cir.1984); *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). Under maritime law, an oral agreement to settle is binding. *Kossick*, 365 U.S. at 734, 81 S.Ct. 886. Indeed, because of the distances involved in shipping contracts, oral settlement agreements are widespread in the industry. *Id.* at n. 4. Thus, the fact there is no written settlement agreement signed by the parties to this case is not dispositive of the question whether a settlement was reached. Moreover, it should be borne in mind that "[c]ompromises of disputed claims are favored by the courts." *Williams v. First National Bank*, 216 U.S. 582, 30 S.Ct. 441, 54 L.Ed. 625 (1910).

Accordingly, the Court is called upon to determine (1) whether a settlement agreement was reached; and (2) whether Paul Campbell had apparent authority to enter into a settlement agreement with Chilsan on behalf of Cosco Bulk. Upon consideration of the record, especially the testimony adduced at the hearing held on August 10, 2000, the Court finds that both questions should be answered in the affirmative.

## A. *The parties reached an agreement on the afternoon of December 2, 2000.*

Testimony given at the hearing indicates that (except for the question of where the funds would ultimately be sent) both Fisher and Campbell agreed that *something* would be resolved—enabling the M/V K FORTUNE to be released—as a result of Cosco Bulk's tendering $96,265.52 to Chilsan. Confusion exists because Fisher believed the funds were being provided in settlement of Chilsan's claim, and Campbell has subsequently testified that he believed the funds were being provided as security. On review of the documentation provided by the parties, and the testimony of both Fisher and Campbell, Fisher's view appears to be the most reasonable under the circumstances. In fact, the circumstantial evidence suggests that up until his conversation with Zang late on the afternoon of December 2, Campbell himself believed he was negotiating a settlement, and only later was informed by his superiors that his authority did not extend that far.

The most telling evidence of this is the fact that while he called Fisher to point out several deficiencies in the first letter Fisher faxed to him (Chilsan Exh. 7, Cosco Bulk Exh. 3a), including the fact that the interest rate was not calculated and a total was therefore missing, and while he acknowledged the use of the terms "settle" and "settlement" in the first paragraph, he said nothing to Fisher about the negotiations being for a security agreement rather than a settlement. Despite Campbell's claim in his affidavit that he did not mention it because he felt it was not his place to comment upon negotiations, it seems incredible to the Court that he would point out other flaws in the proposal as written and not even mention the use of the "settlement" language, if he were in fact negotiating a security agreement.[8]

Another indicia that Campbell was negotiating a settlement agreement is the fact that at the outset of their dealings, Fisher discussed two methods of resolving the seizure (settlement or security), and Fisher testified that Campbell asked what it would take to settle the matter. Fisher's testimony was entirely credible on this point, and consistent with his contemporaneous notes of his first two telephone conferences with Campbell. Chilsan Exh. 5. Further evidence is provided by Campbell's final call to Fisher, in which he apologized for any confusion, since he did not have authority to settle the claim. The clear inference of this statement is that at that point, the deal was off not because a settlement had not been reached, but because Campbell had learned he lacked authority to enter into a settlement.

Also supporting the finding that the parties were negotiating settlement is the fact that the amount sought in the first letter was exactly the value of the bunkers at the time Chilsan paid for them, not 150% of their value at the time of the vessel seizure, as Fisher testified would be expected in a security agreement. For all of these reasons, the Court finds that this matter was settled on the afternoon of December 2, 1999, at the point when the parties had agreed on a figure $96,265.52, after Campbell and Fisher discussed the additional $1000 needed for the U.S. Marshal's fees and Campbell communicated his agreement to the increase.

## B. *Paul Campbell had apparent authority to settle the claim.*

"Maritime law embraces the principles of agency." *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre,* 756 F.2d 1103, 1111 (5th Cir.1985). Actual authority is the power of an agent to do an act on behalf of his principal which he is privileged to do because of the agent's manifestations to him. See Restatement (Second)

---

8. In fact, once this dispute arose over whether there was an agreement to settle, Cosco Bulk posted $145,000, approximately 150% of the value of the claim, as security to allow the release of the vessel.

of Agency, § 7, and *id.*, cmt. a. The scope of an agent's actual authority encompasses acts expressly designated in the principal's manifestations to the agent, as well as acts implied by the manifestations, i.e., acts necessary or incidental to achieving the principal's objectives. *Id.*, cmt. c; *see also Mechanical Wholesale, Inc. v. Universal–Rundle Corp.*, 432 F.2d 228, 230 (5th Cir. 1970). Apparent authority, on the other hand, "is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him." *Cactus Pipe*, 756 F.2d at 1111, citing Restatement (Second) of Agency, § 27. "Apparent authority is distinguished from actual authority because it is the manifestation of the principal to the third person rather than to the agent that is controlling." *Id.*

■ In discussing the case at bar, it is necessary to realize that Campbell was not devoid of any actual authority. In fact, he testified that he was an employee of Sea Mark, which as the owner's protective agent of Cosco Bulk, was authorized to attend to the vessel's cargo operations on the Mississippi river. He does not dispute that in his communications with Fisher, he was acting on instructions from Zang to contact Chilsan's attorneys in New Orleans to see what had to be done to release the M/V K FORTUNE. Nor is it disputed that Zang was acting within the scope of his authority when he instructed Campbell to make inquiries. Thus, Campbell possessed actual authority from Cosco Bulk via his supervisor Zang, to make inquiries into how to resolve the arrest of the vessel. Arguably, one could conclude that settlement negotiations were necessary or incidental to achieving this objective, and thus, Campbell possessed actual authority to settle the claim. He testified, however, that his authority did not extend so far as to allow him to settle the claim without written instructions from his principal.

The Court finds that by its conduct in endowing Campbell with actual authority to inquire into resolving the vessel arrest, knowing that Campbell's instructions required him to contact Chilsan's attorneys in the manner in which he did, Cosco Bulk (as principal) induced a third person (Chilsan's attorney, Robert Fisher), to believe that its agent (Paul Campbell) was authorized to settle the claim. In other words, the nature of the actual authority possessed by Campbell, coupled with the specific instructions to contact Chilsan's attorney, cloaked Campbell with apparent authority to settle the claim.

Moreover, Fisher's reliance on Campbell's apparent authority was justified. All of the outward manifestations observed by Fisher supported the conclusion that Paul Campbell had authority to settle the matter, beginning with the fact that Campbell called Fisher shortly after Fisher was told by the local boarding agent, Kerr–Norton, that someone from Cosco would be contacting him regarding the arrest. Fisher, who had dealt with Cosco before, established from speaking with Campbell that Sea Mark was acting as agent for Cosco Bulk with respect to the M/V K FORTUNE. The identity of Sea Mark's and Cosco's addresses was specifically noted by Fisher. Chilsan Exh. 5. Campbell did not dispute Fisher's testimony that the two had joked about the reasons for Cosco's name change to Sea Mark. More to the point, Campbell testified that he knew that Fisher believed him to be Cosco Bulk's agent authorized to settle the case, but said nothing to disabuse him of this perception.

The Court finds that Fisher's assumption was not "sloppy thinking", but entirely reasonable under the circumstances, and observes that the exhibits introduced by Cosco Bulk support drawing the same conclusion that Fisher did. For instance, Cosco Bulk Exhibit 2, a December 1, 1999 e-mail which was faxed by Campbell to Cosco Bulk's attorneys on June 6, 2000, reflects in the header that it was sent from

Cosco North America. While Campbell attempted to explain this at the hearing by stating that at the time he sent it he was borrowing Cosco N.A.'s fax machine, that does not address the fact that at the time the e-mail was sent (December 1, 1999, during the thick of the negotiations at issue), when Campbell was working for Sea Mark, his e-mail address was "*PCAMPBELL@COSCO–USA.COM*", and his telex address was "6731207 COS-CONA." While Fisher was not privy to this document at the time it was sent, so it cannot be argued that he specifically relied upon it, what this does demonstrate is that notwithstanding Cosco Bulk's and Campbell's contentions that Sea Mark is a distinct entity from all other Cosco entities, the fact is that they are closely related and share many resources including office space and facilities, and confusion between them is inevitable.

Viewing the entire record, and weighing the testimony at the hearing, the Court finds that Campbell had actual authority to look into ways to resolve the arrest (and this is not disputed), and possessed apparent authority to settle the claim with Fisher, and that Fisher reasonably relied on it. It appears to the Court that after a settlement was reached, Cosco Bulk communicated with an attorney who suggested the settlement was ill-advised, and at that point, sought to repudiate the settlement by asserting that the party conducting settlement negotiations lacked the necessary authority. "Federal courts have held under a great variety of circumstances that a settlement agreement once entered into cannot be repudiated by either party and will be summarily enforced." *Strange v. Gulf & South American S.S. Co., Inc.*, 495 F.2d 1235, 1236 (5th Cir.1974), citing *Hennessy v. Bacon,* 137 U.S. 78, 11 S.Ct. 17, 34 L.Ed. 605 (1890). Accordingly, the Court finds that the settlement is binding and enforceable. Therefore,

**IT IS ORDERED** that Chilsan's **Motion to Enforce Settlement** (Rec.Doc. 22) should be and is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that Cosco Bulk's **Motion for Summary Judgment** (Rec.Doc. 27) should be and is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Cosco Bulk's **Motion to Dismiss** *In Rem* **Claim, to Vacate Rule C Arrest of Vessel, to Dissolve Writ of Sequestration of Bunkers, to Release Security, and to Award Damages, Attorneys' Fees, and Expenses** (Rec.Doc. 18), should be and is hereby **DENIED as MOOT**.