**TANKSHIP INTERNATIONAL, LLC, Plaintiff,**

v.

**EL PASO MERCHANT ENERGY– PETROLEUM CO. and El Paso Corp., Defendants**

**No. 3:04CV753 (JBA).**

United States District Court, D. Connecticut.

April 28, 2006.

---

1. In his reply memorandum, Johnson also argues that Rayford's comments created a hostile work environment for Johnson. However, in its September 28, 2005 ruling, the court considered Rayford's remarks in finding that Johnson had not produced sufficient evidence to demonstrate a genuine issue of material of fact with regard to his hostile work environment claim. September 28, 2005 Ruling, p. 26.

Patrick F. Lennon, Tisdale & Lennon, Southport, CT, for Plaintiff.

Frank J. Silvestri, Jr., Janna E. Douville, Levett Rockwood, Westport, CT, for Defendants.

### RULING ON MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION [DOC. # 47]

ARTERTON, District Judge.

In this case arising from an alleged maritime brokerage contract, defendants El Paso Merchant Energy–Petroleum Company and El Paso Corporation (collectively "El Paso") move to dismiss the complaint of plaintiff Tankship International, LLC ("Tankship") for lack of federal admiralty jurisdiction. *See* [Doc. # 47]. For the reasons that follow, defendants' motion is granted.

### I. Factual and Procedural Background

Plaintiff filed the original complaint in this case on May 5, 2004, invoking this Court's diversity jurisdiction. *See* Complaint [Doc. # 1] at 1. Discovery was taken, concluding in July 2005, and a bench trial was initially scheduled for October 2005. *See* Scheduling Order [Doc. # 22]. However, it came to the parties' attention through discovery that complete diversity of citizenship was lacking, and in September defendants were granted permission to

file a motion to dismiss for lack of subject matter jurisdiction. Plaintiff filed an Amended Complaint on October 3, 2005, asserting the existence of federal admiralty and maritime jurisdiction under 28 U.S.C. § 1333, *see* Am. Compl. [Doc. # 45] at ¶ 1, which defendants now challenge. Oral argument was held on December 22, 2005, following which the parties were given an opportunity to file supplemental briefing with an evidentiary record.

The dispositive issue on the jurisdictional dispute here is whether the oral agreement between defendant El Paso and third-party Heidmar was a simple brokerage arrangement in which plaintiff Tankship was to serve as the broker, or whether there was an agreement for Tankship to provide "operational liaison services" to Dorado Pool operator Heidmar and vessel owner OMI Corporation of Stamford ("OMI") as well, with the jurisdiction-conferring objective of furthering maritime commerce. Beyond the evidence submitted on this issue, both parties accept the allegations of the complaint as true for purposes of the motion to dismiss.

The Amended Complaint and supplemental submissions reveal the following facts. Tankship, a Connecticut-based company, is "engaged in the business of maritime charter brokering of ocean going vessels and the provision of services to ship owners, operators, managers, charterers, and vessel pool operators." Am. Compl. at ¶¶ 2, 5. El Paso, a Texas-based company, is "engaged in the petroleum products business, including chartering ocean going petroleum tank vessels." *Id.* at ¶¶ 3, 6. The two companies have a prior relationship, as Tankship has brokered "numerous contracts" involving El Paso in the past. *Id.* at ¶ 10. In September 2000 and May 2001, Tankship brokered long-term deals for El Paso to charter (lease) certain vessels from

OMI, and received a brokerage fee "at the customary rate of 1.25% [of the daily fee] per vessel, per day." *Id.* at ¶¶ 11–13. By early 2002, however, El Paso was losing a significant amount of money on these arrangements "due to the slack tanker market." *Id.* at 20. Thus, plaintiff "approached El Paso ... with a proposal for placing the seven OMI vessels into a vessel pool." *Id.*

As explained in the complaint, "A vessel 'pool' consists of a collection of similar vessel types under various ownerships, placed under the care of a pool administrator. The administrator markets the vessels as a single, cohesive fleet unit and 'pools' their earnings which, in due course, are distributed to individual owners on the basis of a formula, which reflects the different characteristics of the pool vessels." *Id.* at ¶ 21.

The complaint alleges that "[d]espite its mounting losses, at that time El Paso ... was against the idea of placing the OMI vessels in a pool ... and advised Tankship that it had severed all of its relationships with the Dorado Pool operator, Heidmar, earlier in the year." *Id.* at 23. El Paso then decided to begin closing down its marine department altogether, *id.* at ¶ 26, even though it still was obligated under the lease for the seven OMI vessels.

In fall of 2002, Tankship approached the Dorado Pool,[1] which was "receptive" to the suggestion of El Paso's participation by placing the OMI vessels in the pool, and when Tankship returned to El Paso with this information, El Paso "was receptive to the pool concept with Dorado." *Id.* at ¶ 25. However, Heidmar, the pool operator, is a competitor of OMI, the vessel owner, and thus those parties anticipated difficulty in working together directly.

1. Plaintiff's supplemental submission [Doc. # 61] states that Heidmar approached Tankship, but this factual variance is immaterial to the issue of subject matter jurisdiction.

Plaintiff alleges that, to solve this problem, "Tankship proposed... that in addition to brokering the placement of the seven OMI vessels into the Dorado Pool, it would also be willing to offer its services as an operational liaison" between all the parties "to facilitate communication and distribution of information relating to the operation of the vessels during the period the vessels operated in the pool." *Id.* at ¶ 27. Tankship's written proposal to El Paso and Heidmar, however, did not address the issue of "operational liaison services," but merely suggested a "1.25 pct brokerage commission to Tankship." El Paso Marine and Heidmar Proposal, 11/22/02, Silvestri Decl. Ex. C at 2.

At Tankship's urging, a meeting between El Paso and Heidmar took place in December 2002. Plaintiff alleges that the El Paso and Dorado representatives agreed that because El Paso was in the process of closing its marine department, "it would be necessary and desirable to have Tankship provide the operational liaison services" between them. *Id.* at ¶ 29. One of El Paso's representatives at the December 2002 meeting, Matthew Warren, testified that the only discussion at that time concerning Tankship was that Tankship was "the broker involved in the negotiation of this pool." Warren Depo. at 97, Silvestri Decl. Ex. B.

El Paso's written proposal presented at that meeting stated that OMI's vessels were to be placed in the Dorado pool "via Tankship. All operational correspondence with head owner [OMI] to take place via Tankship." *Id.* Ex. D. Timothy Brennan, who attended the meeting on Heidmar's behalf, explained:

Q. What did you mean by writing that?

A. That ... we would just deal with Tankship instead of having to go from ourselves to El Paso to Tankship to OMI. So we would just deal with ourselves and Tankship and OMI and then copy El Paso.

Q. Tankship in that would be the broker?

A. Yes.

Q. The broker between El Paso and the [Dorado] pool, correct?

A. Yes.

Brennan Depo. at 54, Silvestri Decl. Ex. E.

John Douglas Roberts, principal and owner of Tankship, stated in a January 16, 2006 affidavit that by agreeing to participate in this arrangement, Tankship bound itself to offer the following services to El Paso and Heidmar:

a. monitoring the operations and movements of all seven OMI ships on a daily basis;

b. monitoring the particular cargoes being carried by each ship;

c. facilitating the completion of "Q88" vessel questionnaires [2] by the vessel Owner, OMI, and providing such questionnaires to Dorado/Heidmar;

d. negotiation of "letters of indemnity["] ("LOI's") between OMI, Dorado/Heidmar and cargo interests for delivery of cargoes without presentation of bills of lading;

e. negotiation of "letters of indemnity["] ("LOI's") between OMI, Dorado/Heidmar and cargo interests for change of vessel destination;

f. transmission of voyage instructions from Dorado/Heidmar to OMI and/or the captains of the seven OMI vessels (OMI had made it known that it did [sic] would not permit Dorado/Heidmar to communicate

**2.** The substance or purpose of a "Q88" questionnaire is unexplained, but it appears to be a standard form listing the specifications and availability of commercial ships.

with the vessel crew which is essential to daily ship operations);

g. transmission of information between OMI and Dorado/Heidmar relating to the vessels' particulars/characteristics/specifications, e.g. vessel drafts on certain conditions, in relation to particular port calls;

h. coordinating with major oil companies that would use the ships while in the pool to ensure their "approval" of the ships;

i. coordination of claims between Dorado/Heidmar and El Paso and between El Paso and OMI regarding demurrage, dockage fees, wharfage fees, vessel detention, etc.

j. coordination of services provided by "lightering" companies for the discharge of cargoes from the seven OMI vessels at various port calls;

k. communications with third party cargo interests with regard to vessel's [sic] "estimated times of arrival" at loading and discharging ports, cargo stowage plans, rate of loading/discharging affecting the bill of lading date, port changes, bunker/fuel requirements, cargo intake specifications/requirements, vessel/port draft restrictions and vessel characteristics/specifications *not* included in the "Q88" questionnaires; and

l. facilitating agreements between cargo interests, Dorado/Heidmar and OMI regarding commingling of various cargo parcels on board the vessels.

Roberts. Aff. [Doc. # 63] at ¶ 13. There is no evidence that Roberts or any Tankship representative attended the December 16, 2002 meeting between El Paso and Heidmar, and, in fact, the participants explained that the Tankship was specifically excluded because the meeting's purpose was only to present an initial proposal, not to negotiate terms of the transaction. The record also lacks any evidence that the broad range of "services" described by Roberts was contemplated by El Paso and Heidmar, beyond "operational correspondence."

 El Paso placed its vessels in Heidmar's Dorado pool as of April 2003. *Id.* at ¶ 32. El Paso, however, refused to pay any commission to Tankship, asserting that defendant "had no intention of contracting with you or your firm with respect to the entry of the [OMI time-chartered ships] into the Dorado pool ... [and] does not consider itself as being contractually bound to you or your firm in any way with respect to this subject." Roberts Aff. Ex. 4. Tankship has alleged breach of contract for failure to pay the customary commission of 1.25% per day, per ship (Count One), and, alternatively, claims for quantum meruit (Count Two) and unjust enrichment (Count Three). There is no claim that a written brokerage contract existed between El Paso and Tankship.[3]

## II. Standard

"A case is properly dismissed for lack of subject matter jurisdiction ... when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). Under Rule 12(h)(3), the issue of the Court's subject matter jurisdiction may be raised at any time: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3).

---

3. The Statute of Frauds does not apply to maritime contracts because oral contracts are valid under maritime law. *Kossick v. United Fruit Co.,* 365 U.S. 731, 734, 742, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

Thus the Court will consider defendants' motion "because the issue of jurisdiction can be raised any time during the proceedings." *Gonzalez v. Rubin*, 225 F.3d 662 (9th Cir.2000).

"When considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint. But, when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998) (citations omitted). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. *Makarova*, 201 F.3d at 113; *see also Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir.1996) ("The burden of proving jurisdiction is on the party asserting it.").

## III. Discussion

The federal courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction. . . ." 28 U.S.C. § 1333(1). "The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

■ As the Supreme Court recently held, the modern rule is that courts should look to "the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions," because "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." *Norfolk Southern Ry. Co. v. Kirby*, 543 U.S. 14, 24–25, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) (internal citations, quotation marks and alteration omitted, emphasis in original). Thus, the focus usually is "on whether the principal objective of a contract is maritime commerce." *Id.* at 25, 125 S.Ct. 385.

While historically, certain types of contracts have been *per se* excluded from federal admiralty jurisdiction, the *per se* exclusion of agency contracts (*i.e.*, contracts for the procurement of goods) was overruled in *Exxon Corp. v. Central Gulf Lines*, 500 U.S. 603, 607, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991), in favor of the more conceptual "protection of maritime commerce" approach. As noted by the Second Circuit, however, the Supreme Court has not overruled the blanket exclusion of "preliminary services contracts," which "has been applied somewhat mechanically to brokerage agreements involving ship charters." *Shipping Fin.*, 140 F.3d at 132–33.

In *Shipping Financial*, the Second Circuit declined to decide whether *Exxon* should be read to overrule the "preliminary contracts" doctrine as well. 140 F.3d at 133 ("[A]lthough *Exxon* plainly discourages *per se* exclusions to maritime claims, it stops short of entirely eliminating the preliminary contract doctrine. We pass on this opportunity. . . ."). Shipping Financial had alleged that the defendants, Duke Petroleum and an individual owner named Drakos, who were the long-term charterers of a vessel, had requested that plaintiff find a subcharterer. Plaintiff contacted OMI Petrolink Corporation, which operates vessels in the Gulf of Mexico. *Id.* at 131. Plaintiff specifically suggested to defendants that the "Gulf of Mexico lighterage trade offered the best prospects" for finding a subcharter. *Id.* OMI refused the subcharter, and while the plaintiff looked for other options, "OMI entered into a subcharter with defendants . . . through

OMI's broker, causing [plaintiff] to lose an anticipated commission." *Id.* Plaintiff sued Duke and Drakos for breach of contract and unjust enrichment, and OMI for interference with a business relationship. *Id.* The Second Circuit held that even if the modern "nature and subject matter analysis" governed the case, the complaint did not allege facts sufficiently tied to maritime commerce to justify the exercise of federal maritime jurisdiction:

> Essentially..., the contract between plaintiff and defendants involves plaintiff acting as a broker for Duke Petroleum and Drakos. Shipping Services undertook no other responsibilities. Nor does plaintiff's purported role in giving advice about seeking a subcharter in the Gulf lighterage trade elevate its status to anything other than a broker. Plaintiff makes no other affirmative showing that its contract is "maritime in nature."

*Id.* at 134. Thus, although the Court of Appeals emphasized "the fact specific nature of [its] decision," *id.*, it is apparent that a contract for brokerage services would not be viewed by the Second Circuit,[4] as affecting maritime commerce.

▉ Plaintiff Tankship argues that its role was more than that of a broker because it agreed to provide "operational liaison services" that were "inexorably intertwined with the ongoing operation of the OMI vessels in the pool, which engaged exclusively in maritime commerce." Pl. Mem. of Law in Opp. [Doc. # 49] at 13. Plaintiff further argues that "it was Defendants' own actions in breach of the contract that precluded Tankship from providing the operational liaison services," and therefore defendants should not now be heard to deny the existence of such an ongoing agreement. *Id.* at 14.

Contrary to Tankship's assertions, its complaint and supplementary evidence cannot be fairly read to assert or support the existence of any agreement between Tankship and El Paso for ongoing provision of operational liaison services beyond facilitating communication and distribution of information relating to the operation of the vessels while they operated in the pool. Plaintiff alleges that it *"proposed* to both El Paso" and the Dorado Pool that "it would also *be willing to offer* its services as an operational liaison between" the parties. Am. Compl. ¶ 27 (emphasis supplied). The complaint further alleges that the *"Dorado Pool* representatives (Heidmar) and *El Paso* [ ]'s chartering manager, Matthew Warren, *discussed during their negotiations* that it would be necessary and desirable to have Tankship provide the operational liaison services...." *Id.* at ¶ 30 (emphasis supplied). However, not only does the complaint not allege any contractual agreement between *Tankship* and El Paso for Tankship to provide ongoing liaison services related to maritime commerce while El Paso's vessels operated within the Dorado Pool, plaintiff does not seek any damages for breach of any such agreement—the measure of damages sought in this case is the 1.25% brokerage commission. Am. Compl. ¶¶ 35, 41, 47.

The affidavit of John Douglas Roberts, setting forth numerous services Tankship allegedly agreed to provide to Dorado and OMI, contains no basis for his assertions that plaintiff would have been bound to provide the expansive services he describes as encompassed in the role of "operational liaison." Roberts did not attend the December 16, 2002 meeting, which was limited to representatives of El Paso and

---

4. *Cf. Kan Int'l., Inc. v. Coastal Tankships U.S.A., Inc.,* 108 F.3d 1385 (9th Cir.1997) (unpublished table opinion) (holding that "because charterparty brokerage has a significant impact on 'maritime commerce,'" case was governed by federal admiralty law and plaintiff therefore was required to submit its claim for prejudgment interest to the jury).

Heidmar. He does not explain the basis for his belief that an agreement between Tankship and El Paso that plaintiff was the broker contemplated, much less obligated, plaintiff to provide these services. Further, he does not explain how Tankship could become obligated to provide these services during a meeting between Heidmar and El Paso that did not include any representative from Tankship. Roberts states that he believed Tankship became entitled to its commission, which was to be its sole compensation for both its brokerage services and any future "operational liaison services," when El Paso and Heidmar reached a "handshake" deal. Roberts Aff. at ¶ 11. Warren, who actually was present for the "handshake," testified that the only agreement reached by El Paso and Dorado at that time was that Tankship would be considered the broker for the deal. Warren Depo. at 102.[5] There is no evidence that the individuals present in the room had Roberts' detailed list of services in mind when reaching their tentative agreement. While El Paso's written proposal to Heidmar/Dorado for the December 16, 2005 meeting suggested that Tankship would be the conduit for "operational correspondence," the uncontradicted testimony from the individuals present at the meeting shows that the details of Tankship's role never actually came up in the discussion. Warren Depo. at 101–02; Brennan Depo. at 54.

Moreover, even if Tankship's proposal to serve as a go-between, so OMI and Heidmar did not have to deal directly with each other, could be inferred to have been "accepted" by El Paso, the evidence shows that the proposal actually suggested by El Paso to Heidmar was limited to "operational correspondence." Brennan testified that "operational correspondence" meant only that Tankship would pass along directions to and from OMI and Heidmar/Dorado, skipping over El Paso, and that by doing so Tankship was fulfilling the role of broker. Thus the role of intermediary for "operational correspondence" has not been shown to "reference... maritime service or maritime transactions." See Norfolk Southern, 543 U.S. at 24, 125 S.Ct. 385. It is a middleman role that a broker in any field might play, regardless of the subject of the contract, to bring together two competing parties who did not wish to communicate directly, even if in this case the subject matter of those transmitted communications would have included voyage instructions and details.

Plaintiff asserts that it would have been to the benefit of OMI, the vessel owner, and Heidmar, the operator of the Dorado pool, for Tankship to provide liaison services, due to the competition between OMI and Heidmar, and due to the imminent closing of El Paso's marine department, but the existence of these incentives does not support the conclusion that El Paso and Heidmar actually agreed that Tankship should play an ongoing operational role in marine commerce while OMI's vessels were placed with Heidmar.

On this record, the present case is distinguishable from Compania Tauben S.A. v. Stolt Tankers, Inc., 179 Misc.2d 933, 686 N.Y.S.2d 916 (N.Y.Sup.Ct.1998), upon which plaintiff heavily relies. In that case, the plaintiff alleged the existence of a five year contract for the provision of "numerous maritime services," including negotiation of the duration, volume, prices, and selection of ports for all of the defendant's shipping contracts. Id. at 919.

5. Defendants argue that Warren had no authority to bind El Paso to any deal at all, Def. Supp. Mem. at 2, but the Court does not reach the question of whether the "handshake" in fact bound El Paso and Heidmar to a deal, and thus whether Tankship was entitled to a brokerage commission.

Discovery in this case has been concluded and the evidence proffered in support of subject matter jurisdiction does not support the conclusion that any ongoing maritime services agreement was consummated between Tankship and El Paso that contemplated Tankship playing a role beyond liaison for facilitating communication and distribution of information relating to the operation of the vessels among participants, as plaintiff's complaint alleges. This is substantially identical to the agreement in *Shipping Financial.*[6]

The Court concludes that plaintiff's counsel was correct when he initially stated to the Court at the June 10, 2005 status conference that "[t]his is not a maritime case." *See* Tr. at 3, Silvestri Decl. Ex. A. In substance this is a breach of contract case in which Tankship claims a brokerage fee for bringing El Paso and Heidmar together for placement of OMI's vessels in the Dorado pool. Based on the pleadings and evidence presented, plaintiff's claim is not one relating to maritime commerce as required for federal admiralty and maritime jurisdiction, and plaintiff will have to call in another port to seek redress.

## IV. Conclusion

Because this Court lacks subject matter jurisdiction over plaintiff's complaint, defendants' motion to dismiss [Doc. # 47] must be GRANTED and this case will be closed.

IT IS SO ORDERED.

---

6. The Court disagrees with plaintiff that *Norfolk Southern* overruled *Shipping Financial.* *Norfolk Southern* reaffirmed the modern "maritime service or transaction" test, but did not address brokerage contracts; the jurisdictional question in that case was whether a shipping contract that included an international sea voyage from Australia to Virginia, as well as a short overland train trip within Virginia, could be characterized as a maritime contract, which the Supreme Court answered in the affirmative. 543 U.S. at 27, 125 S.Ct. 385.