Edward FONTNEAU, Plaintiff,

v.

The TOWN OF SANDWICH; Gregory Fayne, in his capacity as Harbormaster of the Town Of Sandwich; and Ron Larkin, Richard Judge, Hank Sennott, Pamela Terry and William Diedering, in their capacity as members of the Board of Selectmen of the Town of Sandwich, Defendants.

No. CIV.A.02–10958–WGY.

United States District Court, D. Massachusetts.

March 12, 2003.

Jane Elizabeth Estey, Estey Law Offices Inc., East Sandwich, MA, for Edward Fontneau, Plaintiff.

Leonard H. Kesten, Brody, Hardoon, Perkins & Kesten, Deborah I. Ecker, Brody, Hardoon, Perkins & Keston, Boston, MA, for Town of Sandwich, Gregory F. Fayne, in his capacity as Harbormaster of the Town of Sandwich, Ron Larkin, in his capacity as member of the Board of Selectmen of the Town of Sandwich, Richard Judge, in his capacity as a member of the Board of Selectmen of the Town of Sandwich, Hank Sennott, in his capacity as a member of the Board of Selectmen of the Town of Sandwich, Pamela Terry, in his capacity as a member of the Board of Selectmen of the Town of Sandwich, William Diedering, in his capacity as a member of the Board of Selectman of the Town of Sandwich, Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

Americans love the sea. They approach it with passions usually reserved for interpersonal relations. It is not surprising, therefore, that legal cases are legion resolving disputes over tidal lands, waterways, beach frontage, and even the ability to stare at the sea. This is one such case.

This action arises out of the refusal of the Town of Sandwich Marina ("the Marina") to grant a slip lease to the plaintiff, Edward Fontneau ("Fontneau"). Fontneau and his father jointly owned a boat that was kept in a slip at the Marina. Fontneau's father held the lease to the slip. Upon his father's death, Fontneau wanted the slip lease transferred to him. The Marina's policy, however, is not to allow transfers of slips except, in limited cases, to the surviving spouse of a slip lessee. After his request for the lease was denied, Fontneau brought suit against the Town of Sandwich ("Sandwich"), Harbormaster Gregory Fayne (the "Harbormaster"), and Town Board of Selectmen members Ron Larkin, Richard Judge, Hank Sennott, Pamela Terry, and William Diedering (the "Board") (collectively the "Defendants"), alleging five counts.

Count I asks this Court to annul the Habormaster's decision, as upheld by the Board, not to grant the slip lease, on the basis that it is arbitrary and capricious and exceeds the authority of the decision-makers. Compl. ¶¶ 27–30. Count II complains of breach of an alleged contract between Fontneau and Sandwich that his slip lease, held during 2000 and 2001, would be renewable on a yearly basis. *Id.* at ¶¶ 31–40. Count III alleges promissory estoppel against the Harbormaster, based on an alleged oral promise made in 2000 that Fontneau could remain in the slip notwithstanding the Marina's policy. *Id.* at ¶¶ 40–45. Count IV alleges negligent misrepresentation under Mass. Gen. Laws ch. 258 § 1 *et. seq.,* based on the same alleged representation. *Id.* at ¶¶ 46–51.

Count V [1]—upon which the jurisdiction of this Court is based—alleges violations of the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution and Part 1, Article 1 of the Massachusetts Constitution, based on the theory that permitting slip transfers only to spouses constitutes sex-based discrimination. *Id.* at ¶¶ 47–49.[2] The Defendants here move for summary judgment on all claims against them [Docket No. 17].

## I. INTRODUCTION

### A. Facts [3]

The Marina is located on property owned by the United States Army Corps of Engineers ("Corps of Engineers") and is leased to Sandwich. Def.'s 56.1 Stmt. [Docket No. 19], ¶ 1. The lease requires that Sandwich's use of the property be subject to the general supervision of the Division Engineer of the Corps of Engineers. *Id.* at ¶ 2. It further requires that Sandwich develop a fair and equitable plan for the issuance and assignment of berths from a waiting list and that such plan be submitted to the Division Engineer in writing for approval. *Id.; see also* Pl.'s Opp. to Summ. J. ("Pl.'s Opp.") [Docket No. 20], Ex. 6 (copy of lease), ¶ 32. Pursuant to this requirement, Sandwich has enacted and codified the Sandwich East Boat Basin Marina Rules and Regulations (the "Marina Rules"). *See* Pl.'s Opp., Ex. 4 (copy of rules), ¶ 1.2.

The two most recent versions of the Marina Rules stringently limit the transferability of slips. The current version,

---

**1.** Due to an apparent error, this count is referred to as Count IV.

**2.** Due to an apparent error, the paragraphs in this count are numbered as 47–49, rather than as 52–54.

**3.** As is required in a motion for summary judgment, the following facts are presented in the light most favorable to Fontneau, the non-moving party. All justifiable inferences have been drawn in favor of Fontneau for the purposes of this motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

which the Harbormaster was instructed to enforce as of June 11, 1993 (the "1993 Marina Rules"), has the following provision:

> No slip shall be transferred except in the death of the individual in whose name the slip is assigned. The surviving spouse may request the transfer of the slip to his/her name provided he/she is the owner of fifty-one percent (51%) of the vessel occupying the slip.

Rule 6.6, 1993 Marina Rules (attached to Pl.'s Opp. as Ex. 4). The version prior to that, which was issued in 1992 and took effect on January 1, 1993 (the "1992 Marina Rules"), contained the following similar provision:

> No commercial permanent slip shall be transferable except within the immediate family. Immediate family shall include spouse, children, father, mother, brother and sister.
>
> *No recreational slip shall be transferable except in the event of the death of the lessee holder, the surviving spouse may request the transfer of lease to his/her name provided he/she is the Owner of fifty-one percent (51%) of the vessel occupying the slip.*

Rule 6.6, 1992 Marina Rules (emphasis added) (attached to Defs.' Mem. for Summ. J. ("Defs.' Mem.") [Docket No. 18] as Ex. 5). Before the 1992 Marina Rules took effect, there were apparently no such restrictions on the transferability of slips. Pl.'s Opp. to Protective Order [Docket No. 23], ¶ 11.

Fontneau's collision course with the Marina Rules began in January 1999, when his father passed away. Fontneau's father had been a recreational seasonal slip holder at the Marina since 1959, and Fontneau and his father had co-owned a boat that occupied the slip for the past seven years. Compl. ¶¶ 9–10. Following his father's death, Fontneau wished to retain the slip that his father had held. On February 8, 2000, the Harbormaster sent a letter to Fontneau acknowledging receipt of Fontneau's first half payment and his request to be considered for a larger slip, but also advising Fontneau that the rules of the basin did not allow a slip to be passed to a son or daughter. Defs.' Mem., Ex. 4. To that end, he apparently enclosed a copy of the 1993 Marina Rules and Regulations. *Id.* The letter further stated "[d]o [sic] to the late notice I will allow you to occupy the slip for the 2000 season, however, you should make plans after this season." *Id.*

Fontneau alleges that in or about August 2000, the Harbormaster told him that he could remain in the slip and renew his lease yearly, despite his earlier statement that Fontneau should make alternative arrangements after the 2000 season. Compl. ¶ 14. Specifically, Fontneau states that:

> On or about August of the year 2000, contrary to his earlier position, the Harbormaster told me that I would be allowed to continue to remain in the boat slip and renew my lease yearly, as is the customary practice in the marina. I spoke to him in the harbor. I asked him what when [sic] I would know if I could stay on in the harbor. His answer was "You're all set."

Pl.'s Opp., Ex. 3 (Fontneau Aff.), ¶ 7.

Fontneau's slip lease was in fact renewed for 2001. Compl. ¶ 16; *see also* Pl.'s Opp, Ex. 9 (copy of lease). The Harbormaster acknowledges that such a renewal required his clearance, but states that any clearance was provided inadvertently and was in violation of the Marina Rules. Defs.' Mem., Ex. 6 (Fayne Aff.), ¶ 5. Accordingly, Fontneau leased the slip during 2001. Compl. ¶ 16.

Fontneau did not receive a lease renewal for the 2002 season and, upon inquiry, was told by the Harbormaster that his lease would not be renewed. *Id.* at ¶ 21. He appealed this decision to the Board, as

provided by the Marina Rules, and the appeal was addressed on April 18, 2002 at a public meeting. *Id.* at ¶¶ 22–23. Fontneau was unable to attend this meeting because of travel difficulties. *Id.* at ¶ 24. Although his attorney requested that the matter be continued until such time as Fontneau could attend and speak on the subject of his alleged conversation with the Harbormaster in August 2000, the Board voted at the meeting to uphold the Harbormaster's decision. *Id.* at ¶¶ 25–26. Fontneau subsequently attended the April 25, 2002 Board meeting to explain his side. Pl.'s Opp, Ex. 7 (minutes of April 25, 2002 Board Meeting). According to a newspaper account of the meeting, Selectman Larkin told him, "I am sensitive to your situation, but this is a black-and-white situation. We moved [to uphold the Harbormaster's decision] based on that. The Corps of Engineers holds us responsible that these slips don't stay in perpetuity." Pl.'s Opp, Ex. 7 (*Sandwich Man Fights to Keep Family Boat Slip, Cape Cod Times,* May 18, 2002, at A7).

### B. Procedural Posture

As noted above, the Defendants have moved for summary judgment on all of Fontneau's claims. The Court held a hearing on this motion on December 12, 2002. At that hearing, the Court took the motion under advisement and granted Fontneau 60 days to conduct limited discovery as to whether Rule 6.6 was validly in effect at the time that the Harbormaster denied Fontneau's request for the renewal of the slip lease for the 2002 season. The Defendants have subsequently moved for an order protecting them from responding to Fontneau's requests for additional documents regarding the validity of Marina Rule 6.6. *See* Defs.' Mot. for Protective Order [Docket No. 22]. The Defendants argue that they have already pro-

vided sufficient documentation of Rule 6.6's validity and that Fontneau's further requests are burdensome and unnecessary. *Id.* at ¶¶ 10–11. Thus, at issue before the Court are both the Defendants' Motion for Summary Judgment and the Defendants' Motion for a Protective Order. As the two motions essentially implicate the same underlying issues, the Court addresses them in tandem.

## II. DISCUSSION

### A. Standard of Review

As this is a motion for summary judgment, the Court must review "the entire record 'in the light most flattering to the nonmovant and indulge[ ] all reasonable inferences in that party's favor. Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Company v. Hayes,* 116 F.3d 957, 959 (1st Cir.1997) (internal citations omitted).

### B. Count I—Review of Harbormaster's decision, as upheld by the Board

Fontneau seeks review under Mass. Gen. Laws ch. 249, § 4,[4] alleging that the Harbormaster's decision not to renew Fontneau's lease, as upheld by the Board, was arbitrary and capricious and exceeded his authority. In support of this claim, Fontneau (1) attacks the Harbormaster's interpretation of Rule 6.6 of the 1993 Marina Rules; (2) argues that neither the 1993 Marina Rules nor the 1992 Marina Rules were validly enacted, such that the prior regime—in which there were no limitations on the transferability of slips—is still in place and mandates the renewal of his license; and (3) argues that the Rules are

4. The complaint refers to Mass. Gen. Laws ch. 247, but this appears to be an error.

not being applied consistently and that he was singled out for an improper purpose.

The Court begins with Fontneau's contention that the Harbormaster's interpretation of Rule 6.6 of the 1993 Rules was arbitrary and capricious. Fontneau argues that this rule "is subject to interpretation." Pl.'s Opp. at 7. As noted above, this rule states that "No slip shall be transferred except in the death of an individual. The surviving spouse may request the transfer of the slip to his/her name provided he/she is the owner of 51% of the vessel occupying the slip." Fontneau suggests that these two sentences "could be read separately allowing for an interpretation in favor of a co-owner of a boat in the event of one owner's death." *Id.*

■ This argument is inventive, but must fail. Fontneau seems to be suggesting either (1) that a slip freely can be transferred upon the lessee's death as long as the transferee owns 51% of the vessel, or (2) that a slip freely can be transferred upon the lessee's death, unless the transferee is a spouse, in which case the spouse must own 51% of the vessel. Neither interpretation is supportable. Under the first interpretation, there would be no need to refer specifically to surviving spouses, thus rendering most of the second sentence surplusage. Under the second interpretation, the Rules would be stricter for transfers to spouses than for transfers to non-spouses: a spouse would only be able to receive a transfer upon meeting the 51% ownership requirement, but no such requirement would exist as to other co-owners. This distinction is arbitrary and meaningless. This Court will not adopt an interpretation which renders part of the Rules meaningless or unnecessary.

Fontneau also argues, however, that Rule 6.6 was never validly authorized and enacted and thus cannot be enforced. Pl.'s Supp. Opp. [Docket No. 25], ¶ 8. As noted above, Rule 6.6 apparently came into being

with the 1992 Marina Rules and was subsequently modified slightly by the 1993 Marina Rules. Fontneau has indeed identified certain flaws in the enactment procedures for the 1992 Marina Rules and the 1993 Marina Rules, and a discussion of Fontneau's request for yet further discovery must start with the acknowledgment that the record before the Court does not conclusively prove that either the 1992 Marina Rules or the 1993 Marina Rules were properly authorized and enacted.

In the case of the 1992 Marina Rules, there is no evidence of approval by the Corps of Engineers, as required by Corps of Engineers' lease with Sandwich. Moreover, there is no evidence of publication in a newspaper as required by section 250 of the By-laws of the Town of Sandwich, which state:

> The Board of Selectmen may from time to time, after a public hearing, make reasonable rules and regulations for the use of Town property. Such rules and regulations shall take effect seven (7) days after their publication in a newspaper having general distribution in the Town of Sandwich.

Pl.'s Opp. to Protective Order, ¶ 9.

In the case of the 1993 Marina Rules, there is no evidence of publication, just as with the 1992 Marina Rules. Moreover, while there is evidence that the Corps of Engineers approved the 1993 Marina Rules, there is only the *ipsi dixit* statement appearing on the face of the 1993 Marina Rules themselves that Board's approval was obtained. There are no Board minutes supporting this statement, although there is a June 4, 1993 letter from the Town Administrator to that effect. Def.'s Mot. for Protective Order, Ex. 4.

■ Even if the 1992 and 1993 Marina Rules were not validly issued and enacted, however, the Harbormaster's application of a policy that only permitted transfers of

slips to surviving spouses accurately reflected the explicit policy of the Corps of Engineers. As noted above, Sandwich operates the Marina under the supervisory authority of the Corps of Engineers, which must approve its regulations. A letter from Richard C. Carlson, the Chief of the Construction/Operations Division of the Corps of Engineers, indicates that the Harbormaster's interpretation of Rule 6.6 is the only interpretation that would meet with the approval of the Corps of Engineers. Defs.' Mem., Ex. 2. In that letter, Carlson objects to policies through which "family members may retain a mooring space in perpetuity, thereby gaining a permanent advantage over the general public." *Id.* He explains that "We believe that an individual's prospects for obtaining a mooring ... should not be affected by such criteria as home address, club membership, affiliation with specific commercial or other enterprises, family relationships or the like (although we do consider reasonable the premise that spouses constitute one entity)." *Id.*[5]

As such, the Harbormaster's application of a policy that allows transfers of slip leases in only one circumstance—from a lessee to a surviving spouse, provided that the spouse meets the 51% ownership requirement—is entirely consistent with the expressed policy of the Corps of Engineers, as described above. Indeed, this was one of the Harbormaster's expressed reasons for denying Fontneau's application. Pl.'s Opp., Ex. 8 (Memorandum of Gregory Fayne, March 4, 2002) (stating

that "it would be a violation of Army Corps of Engineers policy of equal access" for Fontneau to maintain his lease.).

Accordingly, the Court rules that the Harbormaster's application of this policy was not arbitrary or capricious. If anything, there is an argument that the Harbormaster's action in granting the 2001 lease to Fontneau was arbitrary and capricious, but—not surprisingly—Fontneau does not object to that action.

With regard to the Board's affirmation of the Harbormaster's decision, Rule 12.3 of the Marina Rules provides that appeals lie to the Board. As such, it is within the Board's authority to uphold the Harbormaster's decision, and, as explained above, the Harbormaster's application of Rule 6.6 was not arbitrary or capricious.

■■ Fontneau raises an additional point requiring consideration. He states that there are factual questions as to "whether the Plaintiff was singled out for an improper purpose" and "whether the rules and regulations are being applied consistently." Pl.'s Opp. at 5. In support of this argument, Fontneau attaches documents showing that the public copy of the waiting list has not been updated in a timely manner, that the list has some apparent irregularities, and that some individuals on the waiting list do not own boats—all of which are not in accordance with the Rules. *Id.; see also* Fontneau Aff., ¶¶ 12–13; Pl.'s Opp, Ex. 5. Even if these allegations are correct (as inferences drawn in favor of Fontneau, the non-moving party) and some rules are

---

**5.** Fontneau correctly points out that this letter was sent not to the Town of Sandwich, but to the Town of Scituate, and thus that it did not involve the particular matter of slip licenses for the Sandwich Marina. Pl.'s Opp. at 6. Fontneau does not argue, however, that this is not the policy of the Corps of Engineers, nor that it is not equally applicable here. Instead, Fontneau argues that "this correspondence is permissive with regard to 'spouses as one

entity' rule, but does not requires [sic] it." *Id.* Indeed, the letter does not *require* towns to permit transfers to spouses in certain situations. It does, however, lead to the inescapable conclusion that there are only two options sanctioned by the Corps of Engineers: allowing transfers to no one; or allowing transfers only to spouses. Neither interpretation allows for transfers to surviving children such as Fontneau.

not being followed correctly, it does not follow that it is arbitrary and capricious of the Harbormaster and the Board of Selectmen to correct a previous failure to follow the Rules. Failure to enforce a rule or regulation in the past does not result in the estoppel of present or future enforcement of the rule. *See Bldg. Inspector of Lancaster v. Sanderson,* 372 Mass. 157, 162–163, 360 N.E.2d 1051 (1977).

The Court notes in passing Fontneau's claim that in the administrative proceedings, "there were acknowledgements [sic] of unfairness to the Plaintiff and discussion of changing the Rule in the future." Pl. Opp. to Protective Order, ¶ 14. In support of this assertion, Fontneau refers to the April 25, 2002 Board meeting minutes, which simply state:

> Edward Fontneau spoke about the hearing the Board held last week regarding his slip at the Marina. He was unavailable that evening and wanted the opportunity to explain his side to the Board. Mr. Larkin said the Board sympathizes with him, however, based on the Marina Rules and Regulations they cannot change their vote.

*Id.,* Ex. 7.

Even assuming that such a discussion occurred during the administrative proceedings, it was entirely prospective and can have no bearing on the decisions to follow Corps of Engineers policy and not renew Fontneau's lease in 2002. Hence, Fontneau fails on this count, and the Defendants' motion for summary judgment on this claim is granted.

### C.  Count II—Breach of contract

This count alleges the formation of a contract between the Harbormaster and Fontneau that Fontneau could renew his slip lease yearly and claims a breach of that contract. Fontneau argues that the contract was formed orally and confirmed in writing—the oral component being his conversation with the Harbormaster in August 2000 and the written component being his renewed lease in 2001. Pl.'s Opp. at 8.

Actually, no written component is necessary. A contract for the mooring of a vessel sounds in admiralty, *Bird v. S.S. Fortuna,* 232 F.Supp. 690, 691 (D.Mass., 1964) (Sweeney, J.); *Selame Assocs. Inc. v. Holiday Inns, Inc.,* 451 F.Supp. 412 (D.Mass.1978) (Maletz, J.), and maritime contracts do not require writing for validity. *Kossick v. United Fruit Co.,* 365 U.S. 731, 735 n. 4, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

The Defendants deny that the August 2000 conversation ever took place. Fayne Aff. at ¶ 7 ("At no time did I promise Mr. Fontneau either orally or in writing that he would be allowed to remain in the slip and be able to renew the slip lease annually."). As this is a motion for summary judgment, however, the inference must be drawn against the Defendants that the oral statement *was* made in August 2000 by the Harbormaster. Nonetheless, Fontneau's own description of that statement indicates that it cannot be construed as creating a contract. Fontneau's affidavit simply states:

> On or about August of the year 2000, contrary to his earlier position, the Harbormaster told me that I would be allowed to continue to remain in the boat slip and renew my lease yearly, as is the customary practice in the marina. *I spoke to him in the harbor. I asked him what when [sic] I would know if I could stay on in the harbor. His answer was "You're all set."*

Fontneau Aff. at ¶ 7 (emphasis added).

This, together with the lease for 2001 (Pl.'s Opp., Ex. 9), comprises the *only* evidence available as to the terms of the alleged contract for a renewable lease. This is problematic, as "[i]t is axiomatic

that to create an enforceable contract, there must be agreement between the parties on the material terms of the contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys. Inc. v. Malouf, Inc.,* 430 Mass. 875, 878, 724 N.E.2d 699 (2000); *see also Mendel Kern, Inc. v. Workshop, Inc.,* 400 Mass. 277, 280–81, 508 N.E.2d 853 ("[A]n intention to do something is not necessarily a promise to do it.").

Here, several material terms are absent. One such term is the duration of this supposedly renewable lease. It appears from Fontneau's affidavit that he asked if he could stay on in the harbor, and was told, "[y]ou're all set." Fontneau's assertion that he was told he could renew his lease yearly into the indefinite future appears to be his own interpretation of this three-word response to his question. The written lease itself contains no right of renewal and states only that it covers the period from May 15, 2001 to October 15, 2001. Pl.'s Opp., Ex. 9. In support of his contention that the lease was renewable, Fontneau points to the 1993 Rules' statement that " 'Seasonal Recreational Slip User' shall mean a recreational vessel owner with a renewable recreational slip at the Sandwich Marina." Rule 4.10, 1993 Marina Rules. Pl.'s Opp at 8. Fontneau's 2001 lease, however, never refers to him as a "Seasonal Recreational Slip User." Pl.'s Opp., Ex. 9. Moreover, the terms of the lease state that the "Marina may refuse to rent dock space to any person for any reason." *Id.* at ¶ 24. In short, there is no basis for inferring—from the Harbormaster's oral and written statements—the duration of the supposedly renewable lease granted to Fontneau by the Harbormaster.

Second, there is no evidence of any price for this renewable lease, other than the price for the 2001 boating season. One reason for the absence of an agreement on price is that the Harbormaster's statement as recounted by Fontneau is better characterized as an "agreement to agree" rather than as a contract. At best, the Harbormaster was promising to offer, on a yearly basis, terms for the lease, which Fontneau would be free to accept or reject at that time.

A further obstacle to construing either the oral or written statements as a contract is the lack of consideration given by Fontneau for the alleged promise by the Harbormaster that Fontneau would be able to remain in the slip and renew his lease each year. *See, e.g., Cass v. Lord,* 236 Mass. 430, 432, 128 N.E. 716 (1920) (stating that for a contract to be valid and enforceable, it must be supported by consideration); *Malihi v. Gholizadeh,* No. Civ. A.973068B, 2000 WL 1299485, at *6 (Mass.Super. Mar. 16, 2000) (Hinkle, J.) ("A contract must of course be supported by consideration to be valid and legally enforceable as a contract."). Fontneau has not indicated that he gave any consideration of any kind for this promise, a promise that notably expands the written terms of the 2001 slip lease for which he did pay.

Accordingly, Fontneau cannot prevail here on a contract theory. The Defendants' motion for summary judgment on this claim is granted.

### D. Count III—Promissory estoppel

This count relies on the same representation by the Harbormaster discussed in the previous section. While the Defendants deny that the representation was made, the contrary inference must be drawn in the summary judgment context.

As the Supreme Judicial Court has explained, "an essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation." *Rhode Island Hospital Trust National*

*Bank v. Varadian,* 419 Mass. 841, 848, 647 N.E.2d 1174 (1995) (internal citations and quotation marks omitted). Fontneau's promissory estoppel claim thus fails for two reasons.

■ First, the ambiguity of the Harbormaster's alleged statement to Fontneau—in that it failed to include such material terms as duration and price—is as fatal to Fontneau's promissory estoppel claim as it is to his contract claim. *See id.* at 850, 647 N.E.2d 1174 (stating that "an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration").

Second, Fontneau's reliance on the Harbormaster's alleged promise was not reasonable, not only because of the ambiguity of the promise, but also because Fontneau himself had been informed that the 1993 Marina Rules forbade the transfer of the license to him.[6] The Harbormaster had told him as much and had even enclosed a copy of the Marina Rules to that effect. Given this indication that the Harbormaster lacked the authority to grant him a renewable lease, and Fontneau's failure to confirm that the Harbormaster had and would continue to have the authority to waive the Marina Rules in his case, Fontneau could not have had more than a well-founded hope that the Harbormaster would continue to renew his lease in the future. Such a hope is insufficient to meet the requirements of a promissory estoppel claim. *See Hall v. Horizon House Microwave, Inc.,* 24 Mass.App.Ct. 84, 93–94, 506 N.E.2d 178 (1987); *Finn v. GenRad, Inc.,* No. CIV.A.20003292C, 2002 WL 532607, at * 6 (Mass.Super. Jan. 17, 2002) (Lauriat, J.) ("A 'well founded hope' is not enough to support reasonable reliance . . . [the defendant's] assurances and offer letter do not

satisfy these requirements because [the defendant] did not have the authority, and [the plaintiff] knew that he did not have the authority, to conclude an employment contract with him.").

For these reasons, Fontneau's promissory estoppel claim must fail. The Defendants' motion for summary judgment on this claim is granted.

### E. Count IV—Negligent Misrepresentation Under Mass. Gen. Laws, chapter 258

As a prerequisite to bringing an action against a public employer for negligent misrepresentation under Mass. Gen. Laws ch. 258, a plaintiff is required to make presentment of his claim to the public employer within two years of the cause of action arising, and the claim is required finally to be denied by the employer. Mass. Gen. Laws ch. 258, § 4. The defendants state that Fontneau failed to make such presentment and, as such, is not entitled to pursue this count. Def.'s Mem. at 13.

■ Fontneau wrote a letter to George H. Dunham, Town Administrator for the Town of Sandwich, on March 18, 2002, outlining his complaint. Pl.'s Opp. at 9; *see also id.,* Ex. 10. This letter did not specifically mention a possible action in negligence, but did enumerate all the facts upon which Fontneau relies in this action. In *Doe v. Town of Plymouth,* 825 F.Supp. 1102, 1111 (D.Mass.1993) (Bowler, M.J.), such a letter was held sufficient for the purpose of section 4, despite a failure specifically to allege negligence. Moreover, Sandwich took action to resolve the matter through the appeal hearing at the public meeting on April 18, 2002, and notified

---

**6.** Although Fontneau now challenges the validity of the process by which the Marina Rules were enacted, he certainly has not claimed that he knew or suspected back in 2000 that the Marina Rules might be unenforceable.

Fontneau of its decision. Pl.'s Opp., Ex. 11. This fulfills the other requirement of section 4—namely, that the public employer has finally denied the claim. The requirements of Mass. Gen. Laws ch. 258, § 4 are therefore satisfied.

This allows the Court to consider the substance of this count. To make out a claim of negligent misrepresentation, Fontneau must show that the Harbormaster, "in the course of his business, supplied false information for the guidance of another upon which [Fontneau] justifiably relied to his financial detriment and that the [Harbormaster] failed to exercise reasonable care or competence in obtaining or communicating the information." *Cole v. New England Mut. Life Ins. Co.,* 49 Mass. App.Ct. 296, 300, 729 N.E.2d 319 (2000).

In support of this claim, Fontneau again refers to the alleged August 2000 conversation with the Harbormaster. He states in his complaint that he "relied on the representations of the Harbormaster" and that he "suffered damages as a result of his reliance on the misrepresentations made by the Harbormaster," in that he "did not seek alternate slip locations for his boat and did not place his name on the waiting list for the Sandwich Town Marina nor did he place his name on the waiting list for other area marinas." Compl. ¶¶ 49–50.

■ Even assuming the statement to have been made, however, Fontneau's allegations do not make out a viable claim of negligent misrepresentation. First, even construing the facts in Fontneau's favor, his reliance on the Harbormaster's assurance was not justifiable. Fontneau was aware of the Marina Rules' prohibition against transfers to a son or daughter— indeed, he himself had received a copy of the 1993 Marina Rules. Yet even on his own evidence, he made no effort to confirm that the Harbormaster would continue to have the ability to waive the Marina

Rules for him. Moreover, Fontneau himself admits that during the six-month period between February 2000 (at which point Fontneau was told to find alternate arrangements for his vessel for the 2001 boating season) and August 2000 (at which point the supposed assurance was given), he lacked any firm assurance that he would be able to keep the slip for the 2001 boating season. Fontneau Aff., ¶ 6 ("On or about February 2000, Gregory Fayne, the Harbormaster for the town of Sandwich notified me that I would no longer have access to the boat slip after the 2000 boating season. I went to the marina office to discuss the issue with Greg. I was told I could use the slip for 2000 and then we would work together to try to work something out.") Nonetheless, throughout that period, Fontneau apparently did not seek alternate slip locations, put his name on the Marina waiting list, or put his name on another marina's waiting list. As such, Fontneau's assertion that he would have done so in the absence of the Harbormaster's August 2000 alleged assurance strains credulity. Finally, although Fontneau alleges that he suffered damages as a result of the Harbormaster's assurance, in that he did not put himself on waiting lists for other marinas, he fails to demonstrate how he suffered *pecuniary* loss as a result, which is an essential element of a negligent misrepresentation claim. *See, e.g., Horvath v. Adelson, Golden & Loria, P.C.,* 55 Mass.App.Ct. 1113, 773 N.E.2d 478 (2002) (unpublished opinion); *Golber v. BayBank Valley Trust Co.,* 46 Mass.App. Ct. 256, 257, 704 N.E.2d 1191 (1999).

Hence, Fontneau cannot establish the facts necessary for a negligent misrepresentation claim. The Defendants' motion for summary judgment on this claim is granted.

### F. Count V—Equal Protection

■ This count is premised on the notion that Rule 6.6 treats married co-

owners differently from unmarried co-owners. Marital status, however, is not of itself a protected class. A classification based on marital status is thus subject only to rational basis review. *See, e.g., Smith v. Shalala,* 5 F.3d 235, 239 (7th Cir.1993); *In re Talmadge,* 832 F.2d 1120, 1125 (9th Cir.1987). Rule 6.6 clearly meets this standard, as it is rationally related to the legitimate purpose of keeping slips open to the public on a first-come, first-served basis, as opposed to letting slips remain indefinitely within the control of a single family.

Fontneau also attempts to argue that Rule 6.6 violates the Equal Protection Clause because it has a disparate impact on males. Even if this is true, however, a showing of disparate impact alone does not make out an Equal Protection claim; a showing that the impact is traceable to a discriminatory *purpose* is required.[7] *See Personnel Admin'r v. Feeney,* 442 U.S. 256, 272–74, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Equal protection claims brought under the Massachusetts Constitution are subject to the same standard. *See Blixt v. Blixt,* 437 Mass. 649, 661 n. 17, 774 N.E.2d 1052 ("The standard for evaluating equal protection challenges under our State Constitution is the same as the standard under the Federal Constitution.") (2002).

Fontneau has not alleged that the policy was enacted with the purpose of discriminating against men, nor set forth any facts in support of that conclusion. Accordingly, the Defendants' motion for summary judgment on this claim is granted.

## III. CONCLUSION

Even if the Rules were not validly enacted, Fontneau cannot succeed on any of the counts in his complaint. The Harbormaster's decision not to renew Fontneau's lease in 2002 was neither arbitrary nor capricious, and did not exceed his authority. Rather, it was entirely in accordance with the stated policy of the Corps of Engineers, under whose supervision Sandwich operates the Marina. As such, the Board's affirmance of the Harbormaster's decision was likewise neither arbitrary nor capricious. Because the August 2000 statement and 2001 lease do not constitute a contract, and the August 2000 statement cannot give rise to promissory estoppel or negligent misrepresentation, the non-renewal of Fontneau's lease in 2002 cannot be impugned on those grounds. Finally, neither Rule 6.6 nor the procedure followed here implicate the Equal Protection Clause, as Fontneau has made no showing that the policy was enacted with the purpose of discriminating against males.

Accordingly, the Defendants' motion for summary judgment [Docket No. 17] is ALLOWED. Given this disposition of the case, the Defendants' motion for a protective order [Docket No. 22] is DENIED as moot.

SO ORDERED.

---

**7.** The case to which Fontneau cites arises in the Title VII context (which does recognize claims of disparate impact), not in the Equal Protection context. See Pl.'s Opp. at 10 (citing *Hill v. Human Rights Comm'n,* 735 F.Supp. 255 (N.D.Ill.1990)).