**EIMSKIP, THE ICELANDIC STEAM-SHIP CO., LTD. and EIMSKIP USA, Inc., Plaintiffs,**

v.

**MAYFLOWER INT'L, LTD. and Atlantic Fish Market, Inc., Defendants.**

No. 02–CV–11499.

United States District Court, D. Massachusetts.

July 14, 2004.

David J. Farrell, Jr., Law Office of David J. Farrell, Jr., S. Chatham, MA, for Eimskip USA, Inc., Eimskip, The Iceland Steamship Company Ltd., Plaintiffs.

Brian P. Flanagan, Flanagan & Hunter, Boston, MA, for Mayflower International Ltd., Defendant.

Gerald J. Zyfers, Newton, MA, for Atlantic Fish Market, Inc., Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LASKER, District Judge.

This is an action to recover unpaid freight charges for 32 containers of frozen herring shipped from Everett, Massachusetts to Tallinn, Estonia on ships operated by EIMSKIP, The Icelandic Steamship Company, Ltd. ("EIMSKIP") in July 2001. The charges due on these shipments total $91,840.

It is undisputed that, in June 2001, EIMSKIP vessels carried two shipments of, respectively, four and fourteen containers of frozen fish to Estonia; that the bills of lading for these shipments listed Mayflower International, Ltd. ("Mayflower") as shipper; and that the freight charges for these shipments were paid by Atlantic Fish Market, Inc. ("Atlantic"). The present suit concerns three subsequent shipments, totaling 32 containers: eleven containers that departed Everett, Massachusetts on July 11, 2001; twelve containers that departed on the same date; and an additional nine containers that departed on July 23, 2001. Freight charges for these third, fourth, and fifth shipments remain unpaid.

EIMSKIP claims that Atlantic and Mayflower were engaged in a joint venture to ship the fish to Estonia and are jointly and severally liable for the freight charges incurred. Atlantic counter-claims against EIMSKIP for abuse of process. Mayflower cross-claims against Atlantic for indemnification and contribution to the extent that Mayflower is found liable.

The case was tried to the bench on March 1 and 2, 2004, with testimony from Rhonda Quilty–Tanner, regional manager at EIMSKIP Canada, Inc.; Boris Sorkin, principal of Atlantic; William C. Quinby, principal of Mayflower; and Leon Gelfand, a former business associate of Sorkin.

### Findings of Fact

On the basis of the testimony and evidence presented, I find as follows:

1. Prior to the unpaid shipments at issue in this case, Atlantic Fish booked two shipments of frozen herring from Everett, Massachusetts to Estonia on EIMSKIP ships. (Exs. 1–9; Quilty–Tanner, Day 1, at 13, 26–29.) At the faxed instructions of Mayflower's Quinby, the bills of lading for those two shipments listed Mayflower as the shipper. (Exs. 3, 6, 9.) Atlantic purchased the cargo, tendering fifty percent of the purchase price to Mayflower upon the loading of the containers, and the balance upon the arrival of the cargo in Estonia. (Quinby, Day 2, at 66.)

2. The bills of lading for the first two shipments state that freight was "Prepaid at U.S. Norfolk VA." Quilty–Tanner explained that the phrase indicates that the freight was to "be paid for in North America as opposed to destination" and that EIMSKIP, consistent with trade practice, extended credit for 30 days after sailing, after which two percent interest accrued. (Quilty–Tanner, Day 1, at 14, 34, 85.) In accordance with the parties' arrangements (*Id.* at 18), EIMSKIP sent invoices to Atlantic for these two shipments (e.g. Ex. 7). Atlantic paid these invoices. (Quilty–Tanner, Day 1, at 27, 93.)

3. Sorkin orally booked a third and fourth shipment bound for Estonia, consisting respectively of eleven and twelve containers of frozen herring (*Id.* at 30–32, 34, 71; Exs. 10, 13) and advised Quilty–Tanner that a fifth shipment would be booked by Quinby (Quilty–Tanner, Day 1, at 37); this fifth shipment ultimately consisted of nine containers (Ex 16). These final three shipments were all shipped "Prepaid at U.S. Norfolk VA."

4. Quilty–Tanner took instructions from both Sorkin and Quinby regarding the shipments. Breaking down the defendants' shipping tasks, Sorkin negotiated the freight rate, (Quilty–Tanner, Day 1, at 56, 69); instructed Quilty–Tanner to hold the original bills of lading (*Id.* at 24); had a mutual agreement with Mayflower that Atlantic Fish would pay EIMSKIP's invoices (*Id.* at 18 (Sorkin told Tanner "he was paying the freight"), 27, 73 (Quinby told Tanner that Sorkin "would pay" and Sorkin confirmed)); went to Estonia to receive the cargo (*Id.* at 56), and paid storage and refrigeration charges there (*Id.* at 57). Quinby inspected the fish as it came off the fishing vessels (Quinby, Day 2, at 53); coordinated the shipment dates;

calculated the number of containers needed for the quantity of cargo (*Id.* at 52); proofed and finalized the bills of lading, (Exs. 3–5; Quilty–Tanner, Day 1, at 21–24); and prepared various export documents (Quinby, Day 2, at 53).

5. Quilty–Tanner testified that from her perspective, Atlantic and Mayflower were engaged in "a type of partnership, and ultimately it just went bad." (Quilty–Tanner, Day 1, at 55.) Sorkin and Quinby, however, both denied the existence of any sort of joint venture or partnership between the two entities, and the record indicates that throughout the period in question, Quinby was acting as an agent for H & L Axelsson,[1] the producers of the fish (Quinby, Day 2, at 64–65; ex. 34), while Atlantic was either itself the buyer of the fish, or acting as an agent for, or joint venturer with, OU Watkins, the entity that ultimately took possession of the cargo and was listed as the "notify party" on all five bills of lading (Quinby, Day 2, at 53; Sorkin, Day 2, at 31).

6. For the third, fourth, and fifth shipments, as for the prior shipments, Mayflower was listed as the shipper on the bills of lading, and the goods were consigned "to order of shipper." (Exs. 11, 14, 18.) These instructions meant that Mayflower was the sole entity authorized to release the containers. (Quilty–Tanner, Day 1, at 63–64; Quinby, Day 2, at 58.) The primary motive for listing Mayflower as shipper on the bills of lading was "to maintain control of the cargo for the owners of the cargo, H & L Axelsson, and not let the cargo be released until they had secure payment." (Quinby, Day 2, at 72.) Quinby, who testified that he has over twenty years of experience in the shipping industry, acknowledged in retrospect that

1. Axelsson is not listed on any of the bills of lading, and EIMSKIP was never informed of Axelsson's existence. (Quilty–Tanner, Day 1, at 69.)

the bill of lading "should have said 'as agent for,' 'on behalf of H & L Axelsson,'" and agreed that it is "bad business to list a non-owner as the shipper on a Bill of Lading". (*Id.* at 50.) Quinby testified that he received only faxed copies of the bills of lading, without the backside terms, disputing Quilty–Tanner's testimony that courtesy copies of all bills of lading had been sent to both Quinby and Sorkin by mail; however, Quinby agreed that the backside terms and conditions governed the contracts of carriage for the 32 containers in dispute. (*Id.* at 57.)

7. The backside terms and conditions of the bills of lading define "Merchant" as including:

> jointly and severally, the shipper, the receiver, the consignee, the holder of this Bill of Lading, any person owning or entitled to the possession of the Goods or of this Bill of Lading and anyone acting, whether as servant or agent or otherwise, of any such person. (Ex. 9.)

Paragraph 16 provides, in pertinent part:

(i) .... Full freight hereunder shall be considered fully earned on receipt of the Goods by the Carrier [EIM-SKIP] and the Carrier shall be entitled to all freight and Charges due hereunder whether actually paid or not, and to receive and retain them under all circumstances whatsoever, the Vessel and/or Goods lost or not lost.

(ii) All unpaid Charges shall be paid in full and without any offset, counterclaim or deduction....

(iv) The Merchant shall defend, indemnify and hold harmless the Carrier against all and any cost incurred by the Carrier in exercising its rights under this clause. (*Id.*)

8. Sorkin denied any involvement with the third, fourth, and fifth shipments, and denied any responsibility for the freight charges due. (Sorkin, Day 1, at 95; Day 2, at 21.) He also denied having booked any of the five shipments. (Sorkin, Day 1, at 91–92; Day 2, at 9–10.) The Court found Sorkin uncooperative, evasive, non-responsive, and less than credible.

9. When the three shipments in question arrived in Estonia in late July, 2001, EIMSKIP placed a hold on the cargo due to outstanding freight charges. (Quilty–Tanner, Day 1, at 44.) During this period, Quinby called Quilty–Tanner to inquire whether freight charges had been paid; he expressed concern that he had not yet been paid for the cargo and stated that he "wasn't prepared to let the cargo go at that time" and that "he was concerned that he was going to get stuck with the freight bill." (*Id.* at 42–43.)

11. During this same period, Sorkin called Quilty–Tanner from Estonia, "very upset" that the goods had not been released. Sorkin threatened to walk away from the cargo if EIMSKIP did not release it immediately (*Id.* at 46) and promised that if the goods were released, he would "pay for this when he got home," (*Id.* at 43). Quilty–Tanner provided Sorkin with the name of her supervisor (Oskar Frederickson); soon thereafter she received a call from Frederickson, who instructed her to lift EIMSKIP's hold on the goods. (*Id.* at 47.)

12. On August 20, 2001, EIMSKIP received a faxed communication from Quinby authorizing the release of the cargo. (Ex. 24.) Upon receiving this fax, Quilty–Tanner contacted EIMSKIP's offices in Estonia and/or Germany and directed them to release the goods. (Quilty–Tanner, Day 1, at 42.) It is undisputed that Watkins received the cargo in Estonia. (Ex. 40; Sor-

kin, Day 1, at 84; Sorkin, Day 2, at 19; Quinby, Day 2, at 83.)

13. The ocean freight incurred was $31,570 for the eleven containers, $34,440 for the twelve containers, and $25,830 for the nine containers, totaling $91,840 for all 32 containers. (Exs. 12, 15, 19.)

14. As with the first two shipments, EIMSKIP sent invoices to Atlantic for the third, fourth, and fifth shipments; these invoices have not been paid. (Quilty–Tanner, Day 1, at 33–36, 39–40.) EIMSKIP at no time invoiced Mayflower for the shipments. (*Id.* at 51.) Quilty–Tanner's testimony regarding Mayflower was contradictory: she initially testified that Mayflower was not invoiced "[b]ecause it wasn't what was arranged" (*Id.* at 51), but later testified that credit was extended to Mayflower as well as Atlantic because "Mayflower is on the Bill of Lading and the documents were approved to go as prepaid, [which] also made Mayflower in under the same umbrella," (*Id.* at 85.)

15. Between August 2001 and July 2002, EIMSKIP sent monthly statements to Atlantic, and Quilty–Tanner had frequent phone conversations with Sorkin in which she offered a variety of payment plans. (*Id.* at 49.) Sorkin never wrote to EIMSKIP to dispute the invoices. In conversations with Quilty–Tanner, Sorkin did not dispute owing the freight charges but rather said that he was "having a bit of trouble right now and that … he would give us something when he could." (*Id.* at 49, 78.) In Quilty–Tanner's final conversation with Sorkin, in July 2002, he for the first time mentioned alleged problems[2] with the cargo as the reason that he had not been paid for the fish (presumably by Watkins) and consequently could not pay the freight charges. (Ex. 26.)

16. It is unclear exactly what ownership interest Atlantic Fish and Mayflower had in the frozen herring cargo shipped in the 32 containers at issue. Quinby testified that the cargo was sold to Atlantic Fish "FOB stowed in Eimskip containers in Everett," which "meant that the fish became Atlantic Fish Market's property at that time." (Quinby, Day 2, at 44.) However, that is inconsistent with Quinby's July 18, 2001 fax to Atlantic stating that Mayflower considered the first twenty-three[3] containers' cargo "unsold" and requesting a "deposit and firm agreement" for the purchase of the cargo. (Ex. 41.) It is also inconsistent with Quinby's efforts to sell the cargo to others besides Atlantic. (Ex. 28; Quinby, Day 2, at 46–47.) Perhaps the most mysterious piece of this puzzle consists of two separate and irreconcilable sets of documents, each purporting to relate to the sale of the 32 containers' cargo. Exhibits 20, 22, and 23 are invoices on Mayflower letterhead, dated respectively August 3, August 16, and August 20, 2001, for the sale of the cargo "C

---

**2.** These alleged problems concerned the quality of the fish and deficiencies in the export documents. It is undisputed that the health certificates for all five shipments were falsified to indicate that the source of the fish was not Axelsson (which lacked European Union certification) but rather a different producer, Lund's Fisheries, Inc. Sorkin testified that, upon discovering the problems with the paperwork, he informed EIMSKIP and Quinby that he had "nothing to do anymore with this cargo." (106:15–16.) However, Sorkin also testified that he knew from the beginning that Quinby was shopping around for a health certificate, and that he paid the freight charges for the first and second shipments despite his knowledge that the health certificates for those shipments had been falsified. It is undisputed that the cargo made entry into Estonia regardless of any alleged problems with the paperwork.

**3.** According to Quinby, the fish that comprised the fifth shipment were "still swimming" on July 18, 2001 and thus were not mentioned in the fax.

and F Tallin" to OU Watkins for a total of $229,743. Quinby testified that he sent these invoices at the direction of Atlantic. (Quinby, Day 2, at 52.) Quilty–Tanner testified that the terms "C & F Tallin" mean that the freight is included in the selling price, which "would indicate to me that I would invoice Mayflower for the freight." (Quilty–Tanner, Day 1, at 53–55.) Exhibit 31B, on Atlantic letterhead, is a "Memorandum of Understanding" dated August 15, 2001 and signed by Daniel Axelsson and by Sorkin, confirming that Axelsson will release the very same cargo to Atlantic (terms of sale unspecified) in consideration for payments totaling $257,120.[4] Ex. 31B. An October 2001 letter from Axelsson to Quinby, requesting assistance in obtaining payment for the cargo, indicates that whatever transaction was memorialized in the Mayflower invoices to Watkins remained unknown to Axelsson:

> H & L Axelsson, Inc., Mayflower, OU Watkins, and Atlantic Fish Market are all involved in this deal. Our vessels produced the product. Mayflower acted as our agent/shipper to sell/ship the product to Atlantic Fish Market/OU Watkins. Atlantic Fish Market, Inc. was the buyer. OU Watkins is listed as the notify address. We agreed to pay Mayflower a percentage for the product sold. This has not changed. We are still awaiting payment for this product. The only change we requested from Boris was to pay H & L Axelsson, Inc. directly rather than pay it through Mayflower. (Ex. 34.)

17. In February 2002, Sorkin wrote to Watkins stating that Atlantic had "received information that it was allegedly paid monies in the amount of $357,120.00 for certain herring, which was previously delivered by H & L Axelson [sic], Inc." and requesting confirmation from Watkins of this payment. (Ex. 35.) In reply, Watkins stated that "the payment to Atlantic Fish Market in the amount of USD 357,-120.00 for HERRING ocean run has not been paid yet due to some circumstances." (Ex. 40.)

18. In the fall of 2001 and continuing into 2002, the period of time following the delivery of this cargo to Estonia, Atlantic was engaged in a joint venture with Watkins through entities referred to as Atlas and Front Holdings for the construction and operation of a fish processing facility in Estonia. (Sorkin, Day 2, at 28–32; Gelfand, Day 2, at 86–90.) A potential investor in this joint venture, Leon Gelfand, was informed by Sorkin in January 2002 that Sorkin "had $400,000 worth of [frozen herring] in Estonia which he would sell and the proceeds would be used to build the plant." (Gelfand, Day 2, 90–91.)[5] I infer that this fish is the same cargo disputed in the present action.

## Conclusions of Law

1. Admiralty jurisdiction is based on 46 U.S.C. § 1333(1) and Fed.R.Civ.P. 9(h). The Court also has diversity jurisdiction under 28 U.S.C. § 1332(a).

2. During the spring and summer of 2001, Atlantic and Mayflower were both engaged in shipping frozen herring under five bills of lading from Everett, Massachusetts to Estonia. The evidence presented is not sufficient to conclude that a

---

4. The Court takes judicial notice of the pendency of another civil action in this District, *H & L Axelsson, Inc. v. Atlantic Fish Market, Inc.*, 02–CV–10927–RGS, brought by Axelsson to recover payments for the cargo at issue.

5. The Court takes judicial notice of the pendency in this District of *Gelfand v. Sorkin*, 03–CV–12571–PBS, brought by Gelfand to recover $500,000 that he allegedly invested in this venture.

joint venture existed between Mayflower and Atlantic. *See Petricca Development Limited Partnership v. Pioneer Development Co.*, 214 F.3d 216, 220 (1st Cir.2000) (setting out factors under Massachusetts law for finding intent to form a joint venture); *Gurry v. Cumberland Farms, Inc.*, 406 Mass. 615, 623–24, 550 N.E.2d 127 (1990) (same). To the contrary, there is evidence that Mayflower was acting as an agent for Axelsson, the seller of the cargo, while Atlantic was engaged in a joint venture with Watkins, the buyer.

3. Although not liable as joint venturers, Atlantic and Mayflower are jointly and severally liable for EIMSKIP's unpaid freight and collection costs.

■ 4. Atlantic orally booked the ocean carriage of the first twenty-three containers at issue, orally arranged to have the subsequent shipment of nine containers booked, and orally agreed to pay their freight. These oral contracts are enforceable in admiralty. *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 n. 4, 81 S.Ct. 886, 6 L.Ed.2d 56 and associated text (1961) ("oral contracts are generally regarded as valid by maritime law"); *Fontneau v. Town of Sandwich*, 251 F.Supp.2d 994, 1001 (D.Mass.2003) ("maritime contracts do not require writing for validity").

■ 5. As the shipper named on the bills of lading, Mayflower is independently liable as a matter of law for the unpaid freight charges and collection costs. The bills of lading at issue here do not specify who is responsible for the freight charges.[6] In *Louisville & N.R.R. v. Central Iron & Coal Co.*, the Supreme Court held that there is a rebuttable presumption that a shipper is liable for freight charges:

Ordinarily, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges; and his obligation is ordinarily a primary one.... For the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf; and a promise by him to pay therefor is inferred (that is, implied in fact).... But this inference may be rebutted, as is the case with other contracts. It may be shown, by the bill of lading or otherwise, that the shipper of goods was not acting on his own behalf; that this fact was known by the carrier; that the parties intended not only that the consignee should assume an obligation to pay the freight charges, but that the shipper should not assume any liability whatsoever therefor; or that he should assume only a secondary liability.

*Louisville & N.R.R. v. Central Iron & Coal Co.*, 265 U.S. 59, 67–68, 44 S.Ct. 441, 68 L.Ed. 900 (1924). Here, Mayflower's role as *both* the shipper and the named consignee only strengthens the presumption of liability, as does Mayflower's "exercise of dominion and control over the shipment." *See States Marine Int'l, Inc. v. Seattle–First National Bank*, 524 F.2d 245, 248 (9th Cir.1975).

■ 6. However, Atlantic's multiple representations to both Mayflower and EIMSKIP that it would be liable for the cargo; the course of dealings among the parties prior to the shipments at issue (in particular, Atlantic's payment of the two prior invoices); and EIMSKIP's decision to lift the hold on the cargo after speaking to Sorkin, are sufficient to rebut the pre-

---

6. As noted above, terms and conditions provide a broad definition of "Merchant" and state that "[t]he Merchant shall defend, indemnify and hold harmless the Carrier against all and any cost incurred by the Carri-
er in exercising its rights under this clause." However, nowhere on the bill of lading does it specify when, or by whom, the payment should be made.

sumption that Mayflower has primary liability for the charges. Accordingly, Mayflower will be liable for freight charges and pre-judgment interest only in the event that EIMSKIP fails to collect from Atlantic.

 7. Additionally, on the basis of these same representations, I conclude that Atlantic is liable to Mayflower for indemnification and contribution to the extent that EIMSKIP collects freight charges and pre-judgment interest from Mayflower.

8. Under the backside terms of the bill of lading,[7] Mayflower and Atlantic are jointly and severally bound to "defend, indemnify and hold harmless the Carrier against all and any cost incurred by the Carrier in exercising its rights" to collect freight charges." Such costs are not the subject of any ancillary agreement, oral or written, among the parties. Hence, Atlantic and Mayflower are jointly and severally liable for such costs, including attorneys' fees, and Mayflower's cross-claims for contribution and indemnification are denied as to these costs.

9. In sum, judgment shall be entered for EIMSKIP against Atlantic and Mayflower jointly and severally for unpaid freight of $91,840 plus pre-judgment interest, subject to the limitation noted above that Mayflower be liable only in the event that EIMSKIP is unable to collect from Atlantic. Judgment shall be entered for Mayflower against Atlantic on its cross-claims for indemnity and contribution. Judgment shall be entered against Atlantic and Mayflower jointly and severally for costs and attorneys' fees.

10. No evidence having been presented on Atlantic's counter-claim for abuse of

process, and EIMSKIP's claims having been found meritorious, judgment shall be entered for EIMSKIP.

It is so ordered.

---

**7.** Quinby conceded that the backside terms and conditions of the bill of lading govern this dispute, and it is therefore unnecessary to determine whether (as Quilty–Tanner testified) he received a hard copy of the bill of lading or merely a fax of the front side.